E. Jay Gotfredson, Esq.  State Bar No. 52428
LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation
283 Ocho Rios Way
Oak Park, California 91377-5540
Tel: (818) 437-5630
reznagoura@aol.com
jay@gotfredonassociates.com

E. Jay Gotfredson, Esq.  State Bar No. 52428
GOTFREDSON & ASSOCIATES
11620 Wilshire Boulevard, 8th Floor
Los Angeles, California 90025
(310) 478-0808 / Fax: (310) 478-3838
(310) 478-0808
(818) 437-5630
jay@gotfredsonassociates.com

Attorney for Plaintiffs DOE JEWISH USC FACULTY
MEMBER 2004 and DOE JEWISH USC STUDENT
1987, Individually And On Behalf Of All
Others Similarly Situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOE JEWISH USC FACULTY MEMBER 2004, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSITY OF SOUTHERN CALIFORNIA, *et al.*, <br><br> Defendants. | Case No. 2:24-cv-05712-FLA (SSCx) <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE** <br><br> **DATE:**  May 2, 2025 <br> **TIME:**  1:30 P.M. <br> **DEPT:**  6B |

1

## Table of Contents

I PRELIMINARY STATEMENT .................................................................................5

II.    STATEMENT OF THE CASE...........................................................................9

III.    FRANKEL v. BOARD OF REGENTS OF THE UNIVERSITY OF CALIFORNIA.......13

IV.    CHANGE OF CIRCUMSTANCES SINCE NOVEMBER 5, 2024 ELECTION.............14

V.    ARGUMENT........................................................................................17

  A.    USC'S POLICIES AND PRACTICES VIOLATED THE FREE EXERCISE CLAUSE.17

    1.    USC discriminates against Plaintiffs based on their religious status..............................17

    2.    USC's policies and practices treat Plaintiffs' religious exercise worse than comparable secular activities.........................................................................18

    3.    USC's policies and practices are not uniformly applied................................................19

    4.    USC cannot satisfy strict scrutiny.................................................................20

  B.    USC'S POLICIES AND PRACTICES VIOLATE THE FREE SPEECH CLAUSE ........20

    1. USC's policies and practices are viewpoint discriminatory. ............................................21

    2. USC's policies and practices compel speech.................................................................21

  C.    USC'S POLICIES AND PRACTICES VIOLATE THE EQUAL PROTECTION CLAUSE........................................................................................22

  D.    USC's POLICIES VIOLATE TITLE VI..............................................................22

VI.    THE COURT SHOULD DENY DEFENDANT'S MOTION IN ITS ENTIRETY ORLIBERALLY ALLOW PLAINTIFF TO AMEND TO ASSERT FEDERAL LAW CLAIMS IN LIGHT OF DEFENDANT'S REMOVAL OF THE COMPLAINT FROM STATE COURT, CHANGED CIRCUMSTANCES SINCE REMOVAL, INCLUDING THE DOJ'S CIVIL RIGHTS TASK FORCE TO COMBAT ANTISEMITISM AT USC AND THE SIGNIFICANT PUBLIC ........................................................................................24

VII.    CONCLUSION........................................................................................26

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

# Table of Authorities

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570, 598 (2023) ..................................................21

*Al Saud v. Days,* 50 F.4th 705, 711 (9th Cir. 2022),..................................................22

*Frudden v. Pilling*, 742 F.3d 1199, 1205 (9th Cir. 2014)..................................................21

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .......................24

*Bacon v. Woodward*, No. 22-35611, 2024 WL 3034850, at *6 (9th Cir. June 18, 2024) .............19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .........24

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).........................................18

*Brown v. Board of Education,* 347 U.S. 483 (1954)..................................................6,7

*Brown, supra*..................................................7

*Carson v. Makin*, 596 U.S. 767, 778 (2022) ..................................................17

*Cf. Greene v. Solano Cnty. Jail*, 513 F.3d 982, 989 (9th Cir. 2008) ..............................................20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 542 (1993)) ..............17

*City of Boerne v Flores, 521 U.S. 507, 534 (1997)* ..................................................20

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, n3 (1989) .......................7

*Fellowship of Chirstian Athletes v. San Jose Unified Sch. DIst. Bd. of Educ.* ("FCA"), 82 F.4th 664 (9ᵗʰ Cir. 2023)..................................................18

*Flores v. Morgan Hill Unified Sch. Dist.*, 324 F. 3d 1130, 1135 (9th Cir. 2003)) .........................7

*Frankel* and *Leona Litka v. Board of Regents, et al.,* ..................................................13

*Frankel v. Regents of the University of California,* Case No. 2:24-CV-4702 ..............................25

*Frankel v. Regents of the University of California,* United States District Court No. 2:24-cv-04702-MCS-PD ..................................................14

*Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)) ............................................21

*Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 440 (1968).........................................22

*Keys v. Humana, Inc.* (6ᵗʰ Cir. 2012) 684 F. 3d 605, 610 ..................................................24

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007)................22

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). ..........................20

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ...........................................................22

*Sherbert v. Verner*, 374 U.S. 398, 406 (1963). ...........................................................................19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202-03

    (2023) ...............................................................................................................................22

*Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ...............................................................................18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ........................17

*United States v. County of Maricop*a, 889 F.3d 648, 652-53 (9th Cir. 2018)................................22

*Wooley v. Maynard,* 430 U.S. 705, 707, 715 (1977) .....................................................................21

*Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ................................................................22, 24

**Statutes**

42 U.S.C. § 2000d..........................................................................................................................22

**Other Authorities**
*T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F.Supp.3d 332, 354-55 (S.D.N.Y. 2014) ...........................23

U.S. Dep't of Educ. OCR, Dear Colleague Letter at 1-2 (Nov. 7, 2023) .......................................23

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

## I PRELIMINARY STATEMENT

Defendant the University of Southern California ("Defendant" or "USC") - once considered among the most prestigious public institutions in the world - has deteriorated into a hotbed of anti-Semitism, confirming for the public that USC's well-known historical antisemitism has not abated at all. This rampant anti-Jewish environment burst into view on October 8, 2023, the day after Hamas terrorists attacked Israel in a harrowing rampage that saw over 1000 innocent Jews, including infants and the elderly, murdered, raped, and mutilated.

As a recipient of federal funds under Title VI of the Civil Rights Act, USC should have taken steps in the wake of these horrifying events to ensure that its Jewish students and faculty were safe and protected from harassment and undeterred in obtaining full access to campus facilities. Instead, USC officials routinely (and ***intentionally***) turned their backs on Jewish students and faculty, aiding and abetting a culture that has allow calls for the annihilation of the Jewish people, Nazi symbolism, and religious slurs to go unchecked and unabated.

While it is true that Plaintiffs' state law claims require proof of "intent" and "violence, intimidation or coercion," it is equally true that what happened to Jewish students and faculty members in the Spring of 2024 and continues to this day on the campus of USC is as intimidating and coercive to a Jewish student or faculty member as the barrel of a gun. USC not only intentionally aided and abetted the Campus Terrorists, mobs and thugs and other supporters (including outside agitators from Hamas) chanting "Death to Israel," "death to Jews," "Death to America," "From the River to the Sea" by allowing them to continue their siege unabated, they made Jewish students and faculty who failed to denounce remain in their dorms and offices feel like second-class citizens. That is segregation pure and simple and unconstitutional.

The material undisputed facts are these:

In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students and faculty - including the individual Plaintiffs and putative classes - were excluded from portions of the USC campus because they

1   refused to denounce their faith.  This fact is so unimaginable and so abhorrent to our

2   constitutional guarantee of religious freedom that it bears repeating:  ***Jewish students***

3   ***and faculty were excluded from portions of the USC campus because they refused to***

4   ***denounce their faith***.

5   (Photographs of the encampment or "Jew Exclusion Zone" that USC allowed on its campus are

6   attached to the Second Amended Complaint ("SAC") as Exhibit "A").

7   USC does not dispute the above facts but asserts that USC has no responsibility to protect

8   the religious freedom of its Jewish students because the "Encampment" or ***"Jew Exclusion***

9   ***Zone"*** alleged in the SAC was engineered by third party "lawful protesters."  But under

10  constitutional principles, USC may not allow services to some students when USC knows that

11  other students are excluded on religious grounds, regardless of who engineered the "Jew

12  Exclusion Zone." It is a flagrant disregard of Plaintiffs' constitutional rights under the Free

13  Exercise Clause.

14  Contrary to USC's assertions, the "separate but equal doctrine" that USC enforced last

15  Spring and still seeks to enforce as a matter of policy was declared unconstitutional in American

16  schools and universities in 1954 in the seminal Supreme Court case entitled *Brown v. Board of*

17  *Education,* 347 U.S. 483 (1954).  In *Brown*, the Court rejected the school administrators'

18  assertions that separate but equal facilities and benefits at public schools – just like the Jew

19  Exclusion Zone and compulsory segregation of Jewish students and faculty that USC condoned,

20  supported and created in this case – run afoul of the Constitution.  *Id.*

21  Defendant's nefarious "intent" is not even material to USC's blatant constitutional

22  violation.  While Plaintiffs assert and continue to contend that USC's aiding and abetting of the

23  Campus Terrorists' activities and indeed, the sponsoring of such activities - was and is more than

24  sufficient to impose liability under the various state law statutes identified in the pleading.

25  Moreover, the SAC does not just allege that USC failed to address discriminatory conduct by

26  third parties on campus – the SAC alleges that USC knew that some Jewish students, including

27  Plaintiffs, were excluded based on their genuinely held religious beliefs on account of the

28  Encampments or "Jew Exclusion Zone," yet consciously chose to aid, abet, encourage, support,

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1  and sponsor the campus terrorists rather than mitigate or ameliorate the discriminatory exclusion

2  by continuing to provide access and benefits to some community members that were not available

3  to Jewish students and faculty. (SAC, para.1-125).  Faced with a decision whether to help the

4  perpetrators or the victims of discrimination, Defendant chose the former. That is no mere

5  "failure to act."  It is overt discrimination.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,

6  489 U.S. 189, 197, n3 (1989) ("The State may not, of course, selectively deny its protective

7  services to certain disfavored minorities without violating the Equal Protection Clause."); *See*

8  *also Flores v. Morgan Hill Unified Sch. Dist.*, 324 F. 3d 1130, 1135 (9th Cir. 2003)).

9      USC's insistence that it did not exclude any individual based on their religious status fails for

10  the same reason.  And USC's argument that the "activists" are the only responsible parties is

11  squarely contradicted by the factual allegations in the SAC, which the court must accept as true,

12  and the applicable law.  Simply stated, making a conscious decision to continue providing access

13  and benefits to non-Jews while allowing Jews to be excluded from campus areas suffices to

14  constitute the kind of affirmative act or "intent" necessary for disparate-treatment liability under

15  the First and Fourteenth Amendments. By USC's logic, a school administrator that stood guard to

16  ensure that the doors stayed open while third parties blocked members of one race from entering

17  to attend class would face no liability. That is not the law and has not been the law since *Brown,*

18  *supra.*

19      And of course, USC did not stop there. As Plaintiffs allege in the SAC, USC not only ordered

20  its security not to intervene in the encampment, but deployed security with instructions to protect

21  the Jew Exclusion Zone and even help its discriminatory criteria.   (SAC, para. 1-125).  USC

22  ordered campus security not to intervene and to erect metal barricades around the encampment

23  thereby helping entrench and defend it. (SAC, para. 1-125).  And of course, USC continued to

24  allow the Campus Terrorists to continue their siege unabated, with their identities concealed from

25  the authorities by Kafiyah scarves, sun glasses and masks, despite USC's own stated policy

26  against wearing any type of clothing or attire that creates a coercive atmosphere on campus.  Id.

27      USC also ordered security to direct Jewish students and faculty away from the encampment,

28  thereby acting as force multipliers. (SAC, para.1-125).   Defendant's attempts to write these

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

actions off as an effort to deescalate, or that appeasing the Campus Terrorists, was in fact helpful to ensuring Plaintiffs' "safety" is as offensive to Plaintiffs as it to most Jews and in any case is irrelevant to the question of whether defendant engaged "actionable" unconstitutional conduct. Unconstitutional action accompanied by even the best of intentions (which USC's conduct did not demonstrate in this case) is unconstitutional.

The Court should deny Defendant's motion to dismiss in its entirety and set noticed hearing on Plaintiffs' request for injunctive relief with respect to their claims against USC.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1

2    **II.  STATEMENT OF THE CASE**

3         In the Spring of 2024 -- fearful of demonstrations that had sprung up at other campuses,

4    including Columbia, NYU, and George Washington University - the Trustees of the University of

5    Southern California  ("USC") (collectively "Defendant University" or "USC") decided to enact

6    an "appeasement policy" to deal with the problem and invited, encouraged, aided, abetted,

7    permitted, allowed, and subsequently negotiated with, enabled and coddled the violent sword and

8    other weapon-wielding, Jew-hating Hamas-supporting terrorist antisemites (the "Campus

9    Terrorists") - who infiltrated and overtook its Los Angeles campus, setting up tents and

10   occupying USC's common areas and other property under the Defendant University's watchful

11   eyes.

12        USC was aware of the encampments springing up at other campuses and pattern and

13   practice of Jewish student hate-mongering "protests" devised by outside agitators that followed

14   the same division and havoc identical to the ones sowed by outside organizations and attitudes,

15   including JFP, JVP and other antisemitic organizations that are now considered to be aligned with

16   antisemitic and anti-America terrorist groups – most recently Hamas.  These Hamas sponsored

17   (and funded) organizations have offices on USC's campus and also regularly participate in USC

18   sponsored activities and promulgate antisemitic material via USC's official internet channel.

19   (True and correct copies of examples affirming USC's sponsorship of such activities are attached

20   to the SAC as Exhibit "D").

21        Starting in late April 2024 and continuing several days into May 2024, USC invited,

22   permitted, coddled and allowed, through an adopted "appeasement policy," a group of "activists"

23   – antisemitic thugs by any other definition - to set up barricades in the center of campus and

24   establish an encampment that blocked access to critical educational infrastructure on campus.

25   (These "activists" are referred to periodically herein as the "Campus Terrorists" (SAC )

26        The Campus Terrorists chanted anti-Semitic threats like "death to the Jews," "free

27

28

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1    Palestine from the hand of Jews," "from the river to the sea, and Palestine will be free," proudly

2    trumpeting their hatred of the Jewish people. But their actions went well beyond such chants or

3    even the pretense of "free speech" or "peaceful protests."[1]

4      With the knowledge and acquiescence of USC officials, the campus terrorists enforced

5    what was effectively a "Jew Exclusion Zone," segregating Jewish students and preventing them

6    from accessing the part of campus including classroom buildings and the main undergraduate

7    library.   (The "Jew Exclusion Zone" is sometimes alternately referred to herein as the

8    "Encampment").  In many cases, the Campus Terrorists set up barriers and locked arms together

9    preventing those who refused to disavow Israel from passing through.  (See Exhibit "A").

10     To enter the Jew Exclusion Zone, a person had to make a statement pledging their

11   allegiance to the Campus Terrorists' views.    While this may have prevented a pro-Israel

12   Christian from entering the zone and permitted access for a Jewish person willing to comply with

13   the enforcers' demands, given the centrality of Jerusalem and the continued existence of the State

14   of Israel to Plaintiffs' Jewish faith (see allegations in SAC), the practical effect was to deny the

15   overwhelming majority of Jews access to the heart of the campus.  The campus terrorists

16   permitted passage to those who passed this Orwellian inquisition.

17     USC's administration knew about the Campus Terrorists' extreme actions, including the

18   exclusion of Jews. But in a remarkable display of cowardice, appeasement, encouragement and

19   illegality, the administration did nothing to stop it. USC chancellor president Carol Folt publicly

20   acknowledged that students had been physically blocked from accessing parts of the campus but

21   failed to call in LAPD until public outcry demanded it.

22     USC not only failed to marshal resources to intervene with the Campus Terrorists - it

23   adopted a policy of facilitating the Jew Exclusion Zone, ordering, among other things, USC

24   campus police and security to stand down, step aside and appease the Campus Terrorists.  And

---

26     [1]    What can be more coercive to a Jew than USC paying lip service to its
antidiscrimination policy while at the same time allowing antisemitic thugs to run amok in the
27   public square – thugs who deliberately conceal their identities and otherwise flout USC's own
policies while taking over buildings in an on-campus siege, shouting "death to Jews?"
28   Segregating Jews to effectively lent support to these Campus Terrorists.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1    rather than instructing campus police and security to assist Jewish students in accessing campus

2    resources, USC instead instructed them to discourage unapproved students from attempting to

3    cross through the Encampment and other areas blocked by the Campus Terrorists.

4         The administration coddled the Campus Terrorists by providing them with megaphones,

5    food, water bottles and other necessities of life so they could carry on with their reign of terrorism

6    against Jewish Students and Faculty.  The water bottles were subsequently used as weapons

7    against any Jews seeking to enter the public buildings within the Jew Exclusion Zone.[2]

8         All told, the Jew Exclusion Zone existed on campus for countless days and what seemed

9    to be an eternity to Jewish students and faculty used to enjoying the benefits of a campus free

10   from terrorism against Jews, wreaking havoc on the lives of Jewish students who were and are

11   simply trying to attend classes and study for exams and Jewish faculty who were trying to grade

12   exams.

13        As more particularly set forth in this SAC, each of the individual Plaintiffs was

14   prevented from passing through the Jew Exclusion Zone during the existence of the Encampment,

15   not to mention the exclusion of all of the Jewish students and faculty in the subclasses.[3]

16        USC boasts of its open inclusive environment that nurtures the growth and development

17   of all faculty, students, administration and staff and assures students that it does not tolerate acts

18   of discrimination, harassment or conduct causing harm to individuals on the basis of race, color,

19   ethnicity, citizenship national origin, or religious beliefs.  USC also has a number of policies that

20   purport to implement these guarantees. But USC has failed to provide Jewish students, faculty,

21   and staff with the protection promised by such policies.  Needless to say, Jews should not fear for

22   their safety when they walk around any public space, let alone the campus of a prominent

23   American research university, as its administrators stand by allowing pro-Hamas terrorists to run

24   amok and take over campus buildings under the guise of lawful "protests."

25   _____

26

27        [3]    USC's assertion via a "Request for Judicial Notice" that the Jewish student
     Plaintiff suffered no harm because she only had to experience the siege and Jew Exclusion Zone
28   the "7-8 days" she is required to attend and study at USC's main campus is without merit.

1    USC's cowardly abdication of its duty to ensure unfettered access to USC's educational

2    opportunities and to protect the Jewish community is not only immoral - it is illegal.  Specifically,

3    it violates numerous federal and state constitutional guarantees, including the equal protection

4    clause, the free exercise clause and the freedom of speech.  And it contravenes the basic

5    guarantee of equal access to educational facilities that receive federal funding, as well as

6    numerous other statutory guarantees of equality and fair treatment.[4]

7    Plaintiffs need immediate injunctive relief to ensure that neither they nor any other Jew

8    will again suffer from the discrimination and indignity they have endured. And because the

9    administrators at USC took actions (or did nothing) which amounts to sanctioning segregation,

10   they are clearly unconstitutional actions entitling Plaintiffs to hold the school's administrators

11   personally liable for their reprehensible failures. Plaintiffs will seek leave to amend this complaint

12   pending discovery to name these individuals as defendants.

13   USC treated Jews disparately and discriminated against them.  As a result, Plaintiffs

14   received a different educational experience than other USC students while elevating the Hamas

15   leaning Campus Terrorists to "heroes" under the guise of "protecting free speech."  USC's

16   treatment of Jews and acquiescence to the Jew Exclusion Zones is repugnant to civilized society.

17   During the siege by the Campus Terrorists and creation of the "Jew Exclusion Zone," USC went

18   so far as to tolerate Nazi swastikas that Jew-haters sprayed on USC property.  (A true and correct

19

20

21

22   [4]    Plaintiffs' SAC purposely pleaded only state law claims arising under the Bane, Unruh, and Ralph Civil Rights Acts, as well as claims for assault and battery.  While Plaintiffs intended to prosecute this purely state court action in the Superior Court, USC removed the case to federal court under CAFA on July 8, 2024.  The Court issued an OSC re remand and Plaintiffs filed a motion for remand asserting additional grounds.  More than seven months later, the Court discharged its OSC, denied Plaintiffs' motion for remand and granted USC's motion to dismiss Plaintiffs' First Amended Complaint ("FAC") with leave to amend.  The Court denied Plaintiffs' ex parte application without prejudice for leave to file a Third Amended Complaint ("TAC"). Plaintiffs intend to do so and include claims under Title VI of the Civil Rights Act, 42 USC section 1983 and (pending further discovery), 42 USC section 1985.  Plaintiffs also intend to file a "Notice of Related Case" pursuant to Local Rule 83.1 et seq. with respect to the *Frankel v. Regents* action described in the SAC in which injunctive relief has already been issued with respect to virtually identical "facts, transactions or occurrences.  Plaintiffs have attached hereto a copy of their [Proposed] TAC pursuant to the Local Rules.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1    copy of a color photograph of a swastika on a USC entry gate taken by one of the Plaintiffs

2    during the siege and occupation of USC is attached hereto as Exhibit "E")

3

4    III. **FRANKEL v. BOARD OF REGENTS OF THE UNIVERSITY OF CALIFORNIA**

5          Plaintiffs' SAC and the original pleadings in this action are replete with allegations that

6    Plaintiffs and other Jewish students and faculty were denied access or the same access to

7    ordinarily available programs, activities, and campus areas based on their sincerely held religious

8    beliefs by virtue of the Jew Exclusion Zone that USC allowed the Campus Terrorists to maintain

9    in the public square.   Under constitutional principles, USC cannot allow services to some

10    students when USC knows that other students are excluded on religious grounds - regardless of

11    who engineered the exclusion.

12          The Jew Exclusion Zone followed the same "game plan" and script as the antisemitism

13    and chaos perpetrated, orchestrated and perpetrated by Hamas and Hamas-leaning campus

14    organizations at other leading American colleges and universities in the Spring of 2024 and still

15    continuing to this day, as evidenced by last week's hateful protests at Columbia's Barnard

16    College.[5]

17          One of the Southern California campuses that the Jew-hating cancer spread to was and is

18    UCLA. In a case filed by Jewish students against USC for similarly permitting, encouraging and

19    tolerating the creation, establishment and maintenance of a virtually identical "Jew Exclusion

20    Zone" on UCLA's Westwood campus, The United States District Court, Honorable Mark C.

21    Scarsi, issued an injunction in favor of Jewish students and against USC enjoining any further

22    antisemitic action and inaction by USC in *Frankel v. Regents of the University of California,*

23

24        [5]    USC's suggestion that Plaintiffs' allegations should not be accepted as true
      because some allegations mirror or parrot the allegations in *Frankel* is meritless.  Of course the
25    pleadings are similar.  Plaintiffs allege in the SAC that the instant case, like *Frankel* and *Leona
      Litka v. Board of Regents, et al.*, another Los Angeles County Superior Court case filed against
26    USC by Plaintiffs' initial counsel of record, are all "related cases" pursuant to Local Rule 83.1 et
      seq. in that they all follow the same pattern and practice or arise out of the "same set of facts,
27    transactions, or occurrences" as this case - namely, the exportation of antisemitism on campuses
      sowed and created by outside agitators and Hamas leaning terrorist organizations from the Ivy
28    League campuses on the East Coast like Columbia and NYU.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1   United States District Court No. 2:24-cv-04702-MCS-PD ("Frankel").  (A true and correct copy

2   of the Court's "Order Re:  Motion for Preliminary Injunction (ECF No. 48) is attached to the

3   SAC as Exhibit "B").  Pursuant to Local Rule 83, Plaintiffs intend to file with their motion for

4   leave to file a Third Amended Complaint (to include federal civil rights claims arising under Title

5   VI and 42 USC section 1983) or in lieu thereof have attached a copy of the proposed TAC to this

6   Opposition if leave to amend is granted.  Plaintiffs also intend to file a "Notice of Related Case"

7   (the "Notice") with respect to *Frankel* because Plaintiffs assert that both cases arise out of the

8   same set of facts, transaction or occurrence  – namely, the spread of a pattern and practice of

9   rampant antisemitism at Southern California university and college campuses and university and

10  college administrators enabling Campus Terrorists sponsored by Hamas – a designated foreign

11  terrorist organization since 1997 -- to create unconstitutional "Jew Exclusion Zones" and

12  perpetrate and cause other harmful conduct against Jewish students and faculty on American

13  college campuses.

14

15

16  **IV.  CHANGE OF CIRCUMSTANCES SINCE NOVEMBER 5, 2024 ELECTION**

17      In years past, Plaintiffs could have come to class at USC with confidence and assurances that

18  the federal government would protect them from anti-Semitism on campus. Regrettably that did

19  not occur under the Biden Administration (regardless of fault) from January 2020 to November

20  2024.

21      Thus, since filing the initial Complaint in June 2024 in response to the siege at USC, there has

22  been a remarkable change of circumstances - though anti-Semitism on USC's campus and other

23  campuses still.  This is particularly so at USC, as evidenced by the DOJ's Task Force targeting

24  USC as one of the 10 schools it initially sought to investigate. President Trump's "Executive

25  Order," as alleged in the SAC, further amplifies the importance in his Administration of

26  combating anti-Semitism and the priority it will be given as opposed to the Biden Administration

27  preceding it.

28

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1      Accordingly, the court should liberally grant Plaintiffs an opportunity to plead whatever claim

2  fits this case as the Task Force just announced its investigation in March 2025. It would be ironic

3  if the reason the Task Force was created was because USC failed to combat antisemitism and a

4  private Complaint seeking compliance with the antisemitism laws in dismissed before the Task

5  Force even starts its work because of form over substance.

6      On November 5, 2024, Donald J. Trump was elected in a mandate to replace Joseph R.

7  Biden as President of the United States ("President Trump"). On January 29, 2025, President

8  Trump issued an executive order identifying additional measures that his government intends to

9  take to combat anti-Semitism (the "Executive Order. Among other things, the Executive Order

10  states that:

11          "It shall be the policy of the United States to combat anti-Semitism vigorously, using

12              all available and appropriate legal tools, to prosecute, remove, or otherwise hold to

13              account the perpetrators of unlawful anti-Semitic harassment and violence."

14  *Id.*

15      President Trump's Executive Order also reaffirmed his prior executive order against

16  antisemitism and noted that the Biden administration effectively nullified his prior order to

17  protect American Jews to the same extent to which all other American citizens are protected. The

18  [new] Executive Order reaffirms [President Trump's prior order against antisemitism] and directs

19  additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of

20  October 7, 2023, against the people of Israel. The executive order correctly notes that these

21  attacks unleashed an unprecedented wave of vile antisemitic discrimination, vandalism, and

22  violence against our citizens, especially in our schools and on our campuses. The order

23  recognized that ***"Jewish students have faced an unrelenting barrage of discrimination; denial***

24  ***of access to campus common areas and facilities, including libraries and classrooms; And***

25  ***intimidation, harassment, and physical threats and assault***. A [House of Representatives] report

26  calls the federal government's failure to fight anti-Semitism and protect Jewish students quote

27  'astounding." This failure is unacceptable and ends today."

28      Towards that end, on March 5, 2025, the Department of Justice ("DOJ") announced the

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1    creation of a "Task Force" within the DOJ's Civil Rights Division to investigate claims of anti-

2    Semitism against 10 college campuses in the United States including USC and USC (the "Task

3    Force"). Thus, as of May 5, 2025, USC and USC were two of the 10 colleges in the United States

4    targeted by the DOJ for federal investigation by the Task Force under allegations that they have

5    not properly addressed campus antisemitism and in particular, failed to protect Jewish students

6    from harm.[6]  Plaintiffs have notified the Task Force about their pending action and are seeking

7    either intervention or a statement of interest from the Department of Justice's Task Force.

8    UCLA's policies and practices violate the Free Exercise Clause in three separately sufficient

9    ways: (1) they discriminate against religious Jews based on religious status; (2) they treat

10    Plaintiffs' religious exercises worse than comparable secular activities; and (3) USC employs a

11    system of discretionary individualized exemptions. Although USC can invoke a strict scrutiny

12    affirmative defense regarding the second and third violations, it cannot meet that burden.

13        The current Trump Administration – unlike the Biden Administration - is once again

14    enforcing the United States' stated policy of designating "Hamas" as a foreign "terrorist group"

15    under federal law.  And the United States refuses to negotiate with Hamas and Hamas supporters,

16    a lesson that USC still refuses to learn.  Among other things, it is beyond reasonable dispute that

17    USC organizations like "Jewish Voices for Peace" ("JVP") and "Justice for Palestine" ("JFP") are

18    sponsored and funded by Hamas, as well as Hamas supporting organizations in the United States

19    and around the World.  JVP and JFP maintain offices on USC's campus and use USC's internet

20    platforms to promulgate their Jew-hating propaganda with the knowledge, consent, acquiescence

21    and encouragement of USC.  USC further encouraged the antisemitism and predictable "Jew

22    Exclusion Zone" by inviting and hiring radical, left-leaning Hamas supporting guest and tenured

23    professors to lecture students in USC-sponsored classes about the "war crimes" of Jews and the

24    State of Israel.  Instead of teaching courses on the subject matter for which they were hired, they

25    spewed antisemitic hate against Jews, Israel and Americans.  Many of these pro-Hamas lecturers

26

27    _____

28    [6]      Plaintiffs have notified the Task Force about this action and are seeking either intervention
or a statement of interest from the Department of Justice's Task Force.

1    and professors also canceled classes and gave extra credit to students who participated in the Jew

2    Exclusion Zone and "protests for Palestine" or against "Genocide."

3          This needs to stop now.  The motion to dismiss should be denied.

4

5    **V.    ARGUMENT**

6

7    ***A.  USC'S POLICIES AND PRACTICES VIOLATED THE FREE EXERCISE CLAUSE***

8          All of Plaintiffs' California state law claims require proof that USC "interfered with" or

9    "attempted to interfere with" Plaintiffs' "civil rights."  Plaintiffs' Bane and Ralph Act claims

10   require proof of "threats, intimidation or coercion" as well.  CACI 3066 (Bane Act), 3068 (Ralph

11   Act).

12         USC's policies and practices violate the Free Exercise Clause in three separately sufficient

13   ways: (1) they discriminate against religious Jews based on religious status; (2) they treat

14   Plaintiffs' religious exercises worse than comparable secular activities; and (3) USC employs a

15   system of discretionary individualized exemptions.

16         USC cannot meet its strict scrutiny burden.

17         **1.  USC discriminates against Plaintiffs based on their religious status.**

18         The Free Exercise Clause "'protect[s] religious observers against unequal treatment'

19   and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on

20   their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458

21   (2017) (alteration in original) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

22   U.S. 520, 533, 542 (1993)). In particular, the Supreme Court has "repeatedly held that a State

23   violates the Free Exercise Clause when it excludes religious observers from otherwise available

24   public benefits." *Carson v. Makin*, 596 U.S. 767, 778 (2022). Here, USC's policies and practices

25   have excluded and will continue to exclude Plaintiffs and other Jews from educational facilities,

26   programs, and parts of campus because of their Jewish religious status. USC has demonstrated

27   that it allows such exclusions. With USC's knowledge and support, activists and USC security

28   officials prevented Plaintiffs from accessing the library, other classroom buildings, and the public

17

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

square. (SAC, para.1-125). And the reason for the exclusion was no secret. As the activists explained, these educational facilities were open only to those willing to denounce Israel and eschew wearing visible Jewish garb, preventing Plaintiffs' sincere religious exercise. (SAC, para 1-125, Exhibit A to SAC). But rather than intervene and end this segregation of Jewish students, USC not only required the campus police to step aside as Jewish students were excluded but even hired security to facilitate the exclusion by reinforcing the encampment's barriers Frankel. Id.

Plaintiffs, as tuition-paying students, have a right to access USC's educational facilities and campus on an equal basis with others and the Jewish faculty class have a right to work in an environment that is not openly and purposely hostile. Yet the religion-based exclusions USC has facilitated prevent that access. The policies therefore subject Plaintiffs to special disfavor and violate the First Amendment's most "basic principle": that excluding religious people because they are religious "is odious to our Constitution." *Trinity Lutheran*, 582 U.S. at 458, 467.

### 2. USC's policies and practices treat Plaintiffs' religious exercise worse than comparable secular activities.

USC's policies and practices violate Plaintiffs' Free Exercise Clause rights in several other ways as well. And there is nothing "neutral and generally applicable" about those policies and practices, as government action flunks that test when it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam); *Fellowship of Chirstian Athletes v. San Jose Unified Sch. DIst. Bd. of Educ.* ("FCA"), 82 F.4th 664 (9th Cir. 2023). Here, USC has burdened two different categories of Plaintiffs' religious exercise. First, Plaintiffs believe they must support Israel and Israel's right to exist. (SAC, ¶para. 1-125) Second, Plaintiffs engage in religious exercises related to their outward expression of Judaism—USC's policies and practices burden both forms of religious exercise. Because USC requires campus and outside police not to disrupt activists, Plaintiffs cannot fully access USC's educational benefits and facilities like everyone else unless they forgo these religious exercises. *Trinity Lutheran*, 582 U.S. at 463; *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). These policies therefore put Plaintiffs to an impossible choice: suppress their religious exercise or surrender their access to

1   USC as a result of the Jew Exclusion Zone.  What can be more intimidating and coercive than

2   this?  See *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). Thus, in addition to alleging adequate

3   "aiding and abetting" and indirect liability under applicable law, Plaintiffs have alleged ***direct***

4   ***intimidation and coercion*** under the Bane, Ralph and Unruh Acts by forcing Plaintiffs to make

5   this unconstitutional choice.  USC deprives those who engage in religious exercise (e.g., wearing

6   a kippah or refusing to denounce Israel) of access to the same educational facilities and benefits

7   other students retained full access to— a clear-cut violation of the *Tandon* principle. See *Tandon*,

8   593 U.S. at 62; FCA, 82 F.4th at 694 (government cannot "treat comparable secular groups more

9   favorably"); see also *Bacon v. Woodward*, No. 22-35611, 2024 WL 3034850, at *6 (9th Cir. June

10  18, 2024). Many examples of secular activities comparable to Plaintiffs' religious exercises were

11  allowed in the Jew Exclusion Zone. For example, a student could wear a hat or religious symbol

12  of almost any sort and still enter the Zone—but students were kept out for wearing a kippah.  And

13  a student could openly support almost any country in the world and enter the Zone—but not

14  Israel. This open discrimination cannot be squared with *Tandon* or *FCA*.

15     **3.  USC's policies and practices are not uniformly applied.**

16      USC's policies and practices are also not "generally applicable" because they involve

17  "discretionary mechanism[s]" of "individualized exemptions." *FCA*, 82 F.4th at 686, 688

18  (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). USCS's policies therefore are

19  not uniformly applied to all students.    For example, policies that say that students may not

20  "block entrances to or otherwise interfere with the free flow of traffic into and out of campus

21  buildings" have been ignored in support of the Campus Terrorists.  (SAC, para.1-125). And USC

22  similarly ignores policies that say that private individuals may not exercise exclusive control over

23  campus facilities or spaces by interfering or obstructing any University employee, student, or any

24  other person having lawful business with the University.  Yet in the Spring of 2024 and as

25  recently as April 3, 2025, USC allowed the activists to do both of those things when it ordered

26  campus and outside police not to interfere with the activists' Jew Exclusion Zone in 2024 and

27  allowed the creation of another encampment on April 3, 2025.  (The Court is requested to take

28  Judicial Notice of the Event that can be seen on this video and URL.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

USC thus effectively has one set of policies for Plaintiffs and other students, but another set for activists who discriminate against Jews. That makes this an even easier case than *Fulton*, where Philadelphia officials merely possessed discretion to deviate from a policy but had not exercised it. See *Fulton*, 593 U.S. at 537; *FCA*, 82 F.4th at 685. Here, USC officials exercised their discretion to exempt the activists from the rules that it had said applied to all, creating an entirely different set of rules for them. And those students in turn exercised their own discretion to decide who could access USC's campus—something that it appears no other students could do even if they wanted to.

### 4. USC cannot satisfy strict scrutiny.

Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v Flores*, 521 U.S. 507, 534 (1997). To pass muster, USC would have to show not only that its policies and practices in fact advance "interests of the highest order," *Lukumi*, 508 U.S. at 546, but that they are also "narrowly tailored" to achieve that interest, *id.* "A law that targets religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780-81. Here, USC fails at the outset because it has no compelling or even legitimate interest in discriminating against Jewish students. *Id.* at 781. Indeed, USC's own stated policies purport to forbid such discrimination, meaning that USC has no interest in discriminating, let alone one of the "highest order." *Lukumi*, 508 U.S. at 546. Nor could categorically and intentionally excluding (and "intimidating" and "coercing") Jewish students from parts of campus (and "intimidating" and "coercing" them into a Hobson's choice) ever be "narrow tailoring"—a ban is one of the bluntest means USC could possibly have used. *Cf. Greene v. Solano Cnty. Jail,* 513 F.3d 982, 989 (9th Cir. 2008) (government must "actually consider[] and reject[] the efficacy of less restrictive measures").

### B. USC'S POLICIES AND PRACTICES VIOLATE THE FREE SPEECH CLAUSE

USC's policies and practices violate the Free Speech Clause because its policies and practices (1) discriminate based on viewpoint; and (2) compel speech.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

**1. USC's policies and practices are viewpoint discriminatory.**

USC's policies and practices are viewpoint-discriminatory because they deny Plaintiffs access to USC's facilities and educational opportunities due to "specific motivating ideology or the opinion or perspective of" Plaintiffs. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). USC has denied full access to anyone (including Plaintiffs) who will not denounce Israel or deny its right to exist. Indeed, after USC learned that activists had established viewpoint-discriminatory checkpoints, it ordered campus and outside police not to dismantle the checkpoints or otherwise intervene. Then, USC reinforced the checkpoints by employing private security as a buffer keeping Plaintiffs and others out.

Thus, USC's policies and practices not only allow for, but actively facilitate, viewpoint discriminatory checkpoints and other actions that exclude Jewish students based on their political and religious speech.

**2. USC's policies and practices compel speech.**

USC also compels Plaintiffs "to speak contrary to [their] beliefs on … significant issue[s] of personal conviction": support for Israel and its right to exist. *303 Creative LLC v. Elenis*, 600 U.S. 570, 598 (2023). By allowing and actively facilitating checkpoints that deny access to Plaintiffs and others who refuse to denounce Israel, USC deprives Plaintiffs of equal access unless they "speak" the government's "preferred message." *Id.* at 586. But government cannot "force[] an individual ... to be an instrument for fostering public adherence to an ideological point of view" that is "repugnant to [her] moral and religious beliefs." *Wooley v. Maynard*, 430 U.S. 705, 707, 715 (1977); see also *Frudden v. Pilling*, 742 F.3d 1199, 1205 (9th Cir. 2014) (same). USC is violating this core First Amendment rule and cannot satisfy strict scrutiny. See discussion under Establishment Clause, *supra*.

USC's policies and practices not only allow for, but actively facilitate, viewpoint discriminatory checkpoints and other actions that exclude Jewish students based on their political and religious speech.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

### C.  USC's POLICIES AND PRACTICES VIOLATE THE EQUAL PROTECTION CLAUSE

Denying access to public educational institutions on the basis religion or ethnicity is a clear-cut violation of the Equal Protection Clause. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202-03 (2023). Indeed, under the Equal Protection Clause, "school officials have the continuing duty to take whatever action may be necessary to create a unitary, nonracial system." *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 440 (1968) (cleaned up). And because "both race and religion are suspect classes," *Al Saud v. Days,* 50 F.4th 705, 711 (9th Cir. 2022), policies that discriminate on these bases must survive strict scrutiny, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). USC has failed—and continues to fail—to equally protect Plaintiffs. Instead, it has abetted activists in their segregation and harassment of Jews. Indeed, USC instructed police not to interfere as Plaintiffs' rights were being trampled on, and even stationed security staff to reinforce the racial and religious segregation and discrimination.  Protecting the perpetrators of discrimination rather than the victims is the opposite of equal protection of the laws. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). USC's practices have discriminated against Jews on the basis of both ethnicity and religion.

### D.  USC's POLICIES VIOLATE TITLE VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. That mandate requires federally-funded schools like USC not only to refrain from their own affirmative acts of discrimination, but to protect students when they are suffering such discrimination at the hand of their peers. See, e.g., *United States v. County of Maricop*a, 889 F.3d 648, 652-53 (9th Cir. 2018). The Supreme Court has long recognized that antisemitism is a form of discrimination on the basis of race or national origin. See *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987). Consistent with that understanding, executive agencies have long interpreted Title VI to prohibit discrimination against Jewish people.[7] As DOE recently reminded

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1  schools post-October-7th, discrimination against members of a religious group falls within Title

2  VI's purview when it is based on actual or perceived "shared ancestry or ethnic characteristics" or

3  "citizenship or residency in a country with a dominant religion or distinct religious identity." U.S.

4  Dep't of Educ. OCR, Dear Colleague Letter at 1-2 (Nov. 7, 2023), https://perma.cc/S7MQ-B77A.

5  The exclusion, harassment, and violence that Plaintiffs and other Jewish students are experiencing

6  at USC plainly fits that bill. Indeed, the perpetrators of those acts have made unambiguously clear

7  that their hostility toward Jewish people is grounded in their actual or perceived connection to

8  Israel. To take just a few examples, agitators have chanted "death to Israel" and "death to Jews"

9  interchangeably on multiple occasions. And activists manning the checkpoints of the Jew

10 Exclusion Zone deemed wearing a Star of David sufficient to label someone a forbidden

11 "Zionist."

12      As courts and agencies have recognized, discriminating against students based on a "style

13 of dress that reflects both ethnic and religious traditions," or is based on where "a student came

14 from or is perceived to have come from," easily falls within Title VI. November 2023 Dear

15 Colleague Letter at 2, supra; see also, e.g., *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F.Supp.3d 332,

16 354-55 (S.D.N.Y. 2014) (collecting cases). Under Title VI USC must prevent such forbidden

17 discrimination from denying Jewish students full and equal participation in the benefits.

18      In years past, plaintiffs could have come to class with assurances that the federal

19 government would protect them from anti-Semitism on campus. Regrettably that did not occur

20 under the Biden administration regardless of fault period since the filing of the complaint, there

21 has been a remarkable change of circumstances though anti-Semitism on campus continues still.

22 This is particularly so at USC, as evidenced by the USC's task force targeting USC as one of the

23 10 schools it initially sought to investigate. President trump's executive order, as alleged in the

24 second amended complaint, further amplifies the importance in this administration of combating

25 anti-Semitism and the priority it will be given as opposed to the administration preceding it.

26 Accordingly, the court should liberally grant plaintiffs an opportunity to plead whatever claim fits

27 this case because anyone with a conscience knows what is happening at USC today and in the

28 spring of 2024 is wrong and immoral and illegal and unconstitutional.

1    Plaintiffs will seek leave to file a Third Amended Complaint ("TAC") to allege "state

2    action" by USC in perpetrating the discrimination against Plaintiffs and the Class and have

3    attached to this Opposition a proposed TAC as required by the Local Rules.

4    USC has failed—and continues to fail—to equally protect Plaintiffs. Instead, it has abetted

5    activists in their segregation and harassment of Jews. Indeed, USC instructed police not to

6    interfere as Plaintiffs' rights were being trampled on, and even stationed security staff to reinforce

7    the racial and religious segregation and discrimination.  Protecting the perpetrators of

8    discrimination rather than the victims is the opposite of equal protection of the laws. *Yick Wo v.*

9    *Hopkins*, 118 U.S. 356, 373-74 (1886). USC's practices have discriminated against Jews on the

10    basis of both ethnicity and religion and cannot satisfy strict scrutiny.

### VI.  THE COURT SHOULD DENY DEFENDANT'S MOTION IN ITS ENTIRETY ORLIBERALLY ALLOW PLAINTIFF TO AMEND TO ASSERT FEDERAL LAW CLAIMS IN LIGHT OF DEFENDANT'S REMOVAL OF THE COMPLAINT FROM STATE COURT, CHANGED CIRCUMSTANCES SINCE REMOVAL, INCLUDING THE DOJ'S CIVIL RIGHTS TASK FORCE TO COMBAT ANTISEMITISM AT USC AND THE SIGNIFICANT PUBLIC

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations omitted)). This is not a

"probability requirement," but a requirement that the factual allegations show "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*  "[D]etermining whether a complaint states a

plausible claim is context specific, requiring the reviewing court to draw on its experience and

common sense." *Id.* at 663-64.

However, as one court has put it*, "[i]f a reasonable court can draw the necessary*

*inference from the factual material stated in the complaint, the plausibility standard has been*

*satisfied." Keys v. Humana, Inc.* (6th Cir. 2012) 684 F. 3d 605, 610.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1      In the Central District, another United States District Court Judge found virtually identical

2  facts so compelling and "plausible" that he issued a preliminary injunction to stop a similar "Jew

3  Exclusion Zone" at USC and its patent segregation against Jews in *Frankel v. Regents of the*

4  *University of California,* Case No. 2:24-CV-4702. (See Exhibit "B" to SAC).

5      Plaintiffs respectfully submit that the "plausibility" standard has similarly been satisfied in

6  this case. Towards that end, the Court is respectfully requested to take Judicial Notice of the

7  Frankel Preliminary Injunction and use it as further guidance in this case.

8      The need for injunctive relief against USC and further efforts to combat antisemitism –

9  like an enforced consent decree banning not only antisemitism but facemasks with no purpose

10  beyond concealing the identity of the perpetrators and creating terror to the victims.

11      USC has done virtually nothing to lessen the antisemitism complained of since the

12  barricades were torn down and the daily terrorism of Jewish students and faculty continues at

13  USC, as evidenced by another encampment going up at USC on April 3, 2025, the date of the

14  Court ordered mediation in this case. While USC's own policies ban the use of clothing or attire

15  in protests designed to coerce or terrorize students or faculty, USC continues to pay lip service to

16  combatting antisemitism while supporting "peaceful protestors" led by Hamas-supporting and

17  Jew-hating on campus organizations (as described in the SAC) march unabated through USC's

18  public square while wearing black and white checkered "Kafiyas," sunglasses and green Hamas

19  flag masks to deliberately conceal their identities and inflict further pain and harm on the Jewish

20  students and faculty and class Plaintiffs in this action.

21      Thus, immediate injunctive relief is similarly necessary and proper in this case.

22      Moreover, there has been a drastic change of circumstances since the Complaint was

23  originally filed in The Los Angeles County Superior Court in May 2024 during the Biden

24  Administration and removed to this Court on July 8, 2024. Among other things, there was a

25  November 2024 election that changed the tone in Washington, DC. Among other things, the

26  Trump Administration has issued an Executive Order against what the President perceived as

27  continuing and unconstitutional anti-Semitism and against universities who have failed to combat

28  it. President Trump also established a civil rights anti-Semitism task force ("Task Force") within

the Department of Justice ("DOJ") to investigate universities who have failed to comply with their federal obligations not to discriminate against Jewish students and faculty. USC was among 10 universities initially targeted for the investigation. Plaintiffs have notified the DOJ and Task Force of the pendency of this case and believe are informed and believe that the DOJ at a minimum will file a "Statement of Interest" in this case (like it has already done in Frankel) or possibly intervene directly in this litigation.

While it is true that USC is a private school, it accepts federal funds and is governed by federal law and in particular, Title VI, which provides that private schools that accept public funding cannot discriminate against students or faculty on the basis of religion or race or provide benefits to one religion or racial group to the exclusion of another.

To the extent that the Court is inclined to grant all or any part of Defendant's motion to dismiss, or Defendant's motion to strike Plaintiffs' class allegations, which were adequately pleaded under California's liberal pleading standards. Plaintiffs' Second Amended Complaint ("SAC") is the first pleading that has been substantively amended since removal by USC. The initial Complaint was modified only once before removal by changing and adding words to two sentences for jurisdictional purposes. No substantive changes were made before the SAC that is the subject of USC's MTD.

Moreover, any delay in determining the pleadings in this case was not the result of anything Plaintiffs did or did not do. It was the result of the several months it took for the Court to determine jurisdiction and thereafter, in rendering a decision on USC's initial MTD filed in July 2024.

## VII. CONCLUSION

For each and all of the foregoing reasons, the Court should deny USC's MTD and Motion to strike in their entirety. In the alternative, the Court should grant leave to amend and allow Plaintiffs to file the proposed Third Amended Complaint attached hereto as **Exhibit 1** in compliance with Local Rules or another amended pleading that conforms to any of the issues raised in the instant motion.

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**

1

2    DATED:  April 11, 2025           LAW OFFICES OF MICHAEL E. REZNICK

3                                        A Professional Corporation

4

5                        By:   */E.Jay Gotfredson/*
                                  E. Jay Gotfredson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE**