1  E. Jay Gotfredson, Esq.  State Bar No. 52428
   LAW OFFICES OF MICHAEL E. REZNICK
2  A Professional Corporation
   283 Ocho Rios Way
3  Oak Park, California 91377-5540
   Tel: (818) 437-5630
4  reznagoura@aol.com
   jay@gotfredonassociates.com

5  E. Jay Gotfredson, Esq.  State Bar No. 52428
   GOTFREDSON & ASSOCIATES
6  11620 Wilshire Boulevard, 8th Floor
   Los Angeles, California 90025
7  (310) 478-0808 / Fax: (310) 478-3838
   (310) 478-0808
8  (818) 437-5630
   jay@gotfredsonassociates.com
9
   Attorney for Plaintiffs DOE JEWISH USC FACULTY
10 MEMBER 2004 and DOE JEWISH USC STUDENT
   1987, Individually And On Behalf Of All
11 Others Similarly Situated

12              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
13

14

15  DOE JEWISH USC FACULTY MEMBER        Case No. 2:24-cv-05712-FLA (SSCx)
    2004, *et al.*,
16                                       **PROPOSED THIRD AMENDED CLASS**
           Plaintiffs,                   **ACTION COMPLAINT AS EXHIBIT 1 TO**
17                                       **OPPOSITION TO DEFENDANT'S**
    v.                                   **MOTION TO DISMISS AND MOTION TO**
18                                       **STRIKE**
    UNIVERSITY OF SOUTHERN
19  CALIFORNIA, *et al.*,

20         Defendants.

21

22

23

24

25

26

27

28

                                    1

# EXHIBIT 1

E. Jay Gotfredson, Esq.  State Bar No. 52428
LAW OFFICES OF MICHAEL E. REZNICK
A Professional Corporation
283 Ocho Rios Way
Oak Park, California 91377-5540
Tel: (818) 437-5630
reznagoura@aol.com
jay@gotfredonassociates.com

E. Jay Gotfredson, Esq.  State Bar No. 52428
GOTFREDSON & ASSOCIATES
11620 Wilshire Boulevard, 8th Floor
Los Angeles, California 90025
(310) 478-0808 / Fax: (310) 478-3838
(310) 478-0808
(818) 437-5630
jay@gotfredsonassociates.com

Attorney for Plaintiffs DOE JEWISH USC FACULTY
MEMBER 2004 and DOE JEWISH USC STUDENT
1987, Individually And On Behalf Of All
Others Similarly Situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOE JEWISH USC FACULTY MEMBER 2004, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSITY OF SOUTHERN CALIFORNIA, *et al*., <br><br> Defendants. | Case No. 2:24-cv-05712-FLA (SSCx) <br><br> **THIRD AMENDED CLASS ACTION COMPLAINT FOR** <br><br> **(1)  VIOLATION OF THE BANE ACT [California Civil Code section 52.1]** <br> **(2)  VIOLATION OF THE UNRUH ACT [California Civil Code section 51]** <br> **(3)  VIOLATION OF THE RALPH ACT [California Civil Code section 51.7]** <br> **(4)  NEGLIGENCE** <br> **(5)  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS** <br> **(6)  ASSAULT** <br> **(7)  BATTERY** <br> **(8)  BREACH OF CONTRACT** <br> **(9)  DECLARATORY RELIEF** <br><br> **(10)    42 USC 1983 [Equal Protection]** <br> **(11)    42 USC 1983 [Freedom of Speech]** <br> **(12)    42 USC 1983 [Free Exercise Clse.]** <br> **(13)    VIOLATION OF TITLE VI CIVIL RIGHTS ACT OF 1964** <br><br> **DEMAND FOR JURY** |

**PRELIMINARY STATEMENT RE CHANGED CIRCUMSTANCES SINCE ORIGINAL FILING - INCLUDING INJUNCTION ISSUED BY THE UNITED STATES DISTRICT COURT IN FAVOR OF JEWISH STUDENTS AGAINST USC IN A CLEARLY "RELATED CASE," *FRANKEL v. REGENTS*, 2:24-CV-04702, TO ENJOIN "JEW EXCLUSION ZONES" IDENTICAL TO THE ONE PLAINTIFFS ALLEGE THAT USC AIDED, ABETTED, ENCOURAGED, ENABLED, ASSISTED AND SUPPORTED AND FEDERAL ANTISEMITISM TASK FORCE TO TARGET USC'S ANTISEMETISM**

1.    This case does not litigate the merits of the armed conflict in Gaza or the merits of protest or counter-protest movements responding thereto. Nor is this case about the content or viewpoints contained in any protest or counter protest slogans or other expressive conduct, which are generally protected by the 1st amendment. See *Virginia v. Black*, 538 US 343, 358 (2003) ("The hallmark of the protection of free speech is to allow free trade of ideas - even ideas that the overwhelming majority of people might find distasteful or discomforting").

2.    But the free exercise clause provides that "Congress shall make no law... prohibiting the ['free exercise of religion']." U.S. Const., amend. I; see also *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (recognizing the Free exercise clause extends to the States under the Fourteenth Amendment). The clause "protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status. (See *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("The Free Exercise Clause 'protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status"). *Carson v. Makin*, 596 U.S. 767, 778 (2022) ("[W]e have repeatedly held that a state violates the free exercise clause when it excludes religious observers from otherwise available public benefits.").

3.    The material undisputed facts are these:

> In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students and faculty - including the individual Plaintiffs and putative classes - were excluded from portions of the USC campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent to our

2

constitutional guarantee of religious freedom that it bears repeating: ***Jewish students and faculty were excluded from portions of the USC campus because they refused to denounce their faith***.

4.   USC does not dispute the facts alleged hereinabove but asserts that USC has no responsibility to protect the religious freedom of its Jewish students because the "Encampment" or ***"Jew Exclusion Zone"*** alleged in this Second Amended Complaint ("SAC") was engineered by third party "lawful protesters."  But under constitutional principles, USC may not allow services to some students when USC knows that other students are excluded on religious grounds, regardless of who engineered the "Jew Exclusion Zone." It is a flagrant disregard of Plaintiffs' constitutional rights under the Free Exercise Clause.

5.   USC not only tolerated, encouraged, aided, abetted, enabled, and indirectly funded (along with other taxpayers) the "Jew Exclusion Zone," but also invited and hired many of the Jew-hating organizers to the USC campus to lecture students.  USC also enabled these so-called third party "protesters" by providing them with megaphones, food, encouragement and water bottles that were used as projectiles against Jews in an attempt to further harm Jewish USC students, faculty and others who tried to seek entrance without denouncing "Zionism."  (True and correct depictions of the USC "Jew Exclusion Zone" are in the I Phone photographs attached hereto as Exhibit "A").

6.   As further alleged in this SAC, the "third party protestors" in fact were a mob of antisemitic thugs (hereinafter referred to as the "Campus Terrorists") and the Jew Exclusion Zone was created, funded, and orchestrated by a number of so-called outside agitators – including the George Soros, Tides Foundation and Rockefeller Brothers – and included were comprised of not only Jew-hating students, but also faculty members and more importantly, outside, third-party "agitators" who do not even attend USC.  USC not only facilitated the Jew Exclusion Zone it allowed this to happen, acquiescing in the antisemitism with knowledge that the harm to Plaintiffs and destruction of property was virtually certain to occur, since USC knew or certainly should have known that the antisemitism and hatred of Jews that gave rise to the exclusion zone was being exported to West Coast universities and colleges from liberal "Ivy League" colleges and

1  well-organized hatemongers on the East Coast and Democratic Party and other donors who were

2  funding the sieges, occupations and operations taking place at college campuses en masse in the

3  Spring of 2024 and continues to this day.

4      7.   USC had plenty of historical precedent to rely on.  What started as an isolated

5  movement of antisemitic "protests" on East Coast campuses like Columbia, NYU and George

6  Washington University about the ongoing Gaza conflict between Israel and Hamas turned into

7  multiple instances of "Jewish Exclusion Zones" and similar ad hoc but well-funded

8  "Encampments" that excluded Jewish students and faculty at college campuses across America.

9  Discriminating against and excluding Jewish students festered like a malignant cancer, spreading

10  across university campuses with almost daily reports of different new colleges and universities

11  coming under attack.  And the attacks were clearly well-organized.   Among other things, "tents"

12  and other structures erected by the Campus Terrorists all looked the same and came from the

13  same expensive suppliers, and the "protest signs" all carried the same obnoxious Hamas

14  propaganda and carefully designed slurs and slogans against Jews that are well known to most

15  Americans by now, such as ""from the River to the sea, Palestine will be free," "freedom for

16  Palestine," "divest from death," and related propaganda.

17      8.   USC did nothing to discourage antisemitism on its campus but rather facilitated it and

18  appeased the Campus Terrorists.  Among other things, USC invited and tolerated Jew-hating and

19  Hamas supported organizations like "Justice for Palestine" ("JFP") and "Jewish Voices for

20  Peace" ("JVP") to set up offices on campus for the purpose of spewing Jewish hatred and Hamas

21  sponsored antisemitic propaganda to USC students and faculty.  USC also allowed alleged

22  "protesters" to roam freely at the USC campus while concealing their identities with face masks,

23  sunglasses and the traditional Keffiyeh scarves, denouncing Jews and advocating their harm,

24  death, eradication, and destruction such that it became business as usual.  Instead of calling the

25  LAPD or campus security to step in and remove the trespassers and quell the clear disturbance on

26  campus caused by the Jew Exclusion Zone, USC provided them with megaphones, food, and

27  water bottles that were used as projectiles and weapons against Jewish students and others

28  attempting to seek entrance to the Jew Exclusion Zone.

9.   This SAC and the original pleadings in this action are replete with allegations that Plaintiffs and other Jewish students and faculty were denied access or the same access to ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs.   Under constitutional principles, USC cannot allow services to some students when USC knows that other students are excluded on religious grounds - regardless of who engineered the exclusion.

10.   One of the Southern California campuses that the Jew-hating cancer spread to was and is USC. In a case filed by Jewish students against USC for similarly permitting, encouraging and tolerating the creation, establishment and maintenance of a virtually identical "Jew Exclusion Zone" on USC's campus, The United States District Court, Honorable Mark C. Scarsi, issued an injunction in favor of Jewish students and against USC enjoining any further antisemitic action and inaction by USC in *Frankel v. Regents of the University of California,* United States District Court No. 2:24-cv-04702-MCS-PD ("Frankel").  (A true and correct copy of the Court's "Order Re:  Motion for Preliminary Injunction (ECF No. 48) is attached hereto as Exhibit "B" and incorporated herein by this reference). Pursuant to Local Rule 83, Plaintiffs have filed concurrently with this SAC a "Notice of Related Case" with respect to Frankel because Plaintiffs assert that both cases arise out of the same set of facts, transaction or occurrence  – namely, the spread of a pattern and practice of rampant antisemitism at Southern California university and college campuses and university and college administrators enabling Campus Terrorists sponsored by Hamas – a designated foreign terrorist organization since 1997 -- to create unconstitutional "Jew Exclusion Zones" and perpetrate and cause other harmful conduct against Jewish students and faculty on American college campuses.

11. On November 5, 2024, Donald J. Trump was elected in a mandate to replace Joseph R. Biden as President of the United States ("President Trump"). On January 29, 2025, President Trump issued an executive order identifying additional measures that his government intends to take to combat anti-Semitism (the "Executive Order").  (A true and correct copy of the Executive Order is attached hereto as Exhibit C).  Among other things, the Executive Order states that:

"It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."

*Id.*

12. The Executive Order also reaffirmed President Trump's prior executive order against antisemitism and noted that the Biden administration effectively nullified his prior order to protect American Jews to the same extent to which all other American citizens are protected. The [new] Executive Order reaffirms [President Trump's prior order against antisemitism] and directs additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. The executive order correctly notes that these attacks unleashed an unprecedented wave of vile antisemitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. The order recognized that ***Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; And intimidation, harassment, and physical threats and assault***. A [House of Representatives] report calls the federal government's failure to fight anti-Semitism and protect Jewish students quote 'astounding." This failure is unacceptable and ends today."

13. Toward that end, on March 5, 2025, the Department of Justice ("DOJ") announced the creation of a "Task Force" within the DOJ's Civil Rights Division to investigate claims of anti-Semitism against 10 college campuses in the United States including UCLA and USC. Thus, as of May 5, 2025, UCLA and USC were two of the 10 colleges in the United States targeted by the DOJ for federal investigation by the Task Force under allegations that they have not properly addressed campus antisemitism and in particular, failed to protect Jewish students from harm. Plaintiffs have notified the Task Force about their pending action and are seeking either intervention or a statement of interest from the Department of Justice's Task Force.

14. Unlike the Biden Administration, the former Trump Administration enforced and is once again enforcing the United States' policy of designating "Hamas" as a foreign "terrorist group" under federal law. Among other things, unlike USC, the United States refuses to negotiate with

Hamas and Hamas supporters, a lesson that USC refuses to learn. Among other things, it is beyond reasonable dispute that USC organizations like "Jewish Voices for Peace" ("JVP") and "Justice for Palestine" ("JFP") are sponsored and funded by Hamas, as well as Hamas supporting organizations in the United States and around the World. JVP and JFP maintain offices on USC's campus and use USC's internet platforms to promulgate their Jew-hating propaganda with the knowledge, consent, acquiescence and encouragement of USC. USC further encouraged the antisemitism and predictable "Jew Exclusion Zone" by inviting and hiring radical, left-leaning Hamas supporting guest and tenured professors to lecture students in USC-sponsored classes about the "war crimes" of Jews and the State of Israel. Instead of teaching courses on the subject matter for which they were hired, they spewed antisemitic hate against Jews, Israel and Americans. Many of these pro-Hamas lecturers and professors also canceled classes and gave extra credit to students who participated in the Jew Exclusion Zone and "protests for Palestine" or against "Genocide."

15. This case is not about "free speech" or the First Amendment rights of JVP, JFP, Hamas or any other left-leaning, radical speaker or "lawful peaceful protests" but rather about the religious freedom of Plaintiffs and USC's encouragement of the disparate treatment and harm Plaintiffs suffered. As alleged herein, Jews were told to stay in their dorms or offices if they did not like it or could not tolerate it. Jewish students and faculty members were treated as "second class citizens" by USC. USC aided, abetted, encouraged, tolerated, and implemented as policy the Terrorist Mob's "Jew Exclusion Zone." USC not only condoned, allowed, aided, abetted, tolerated and encouraged the Jew Exclusion Zone, trespass and destruction of property on its campus and open space, it became USC's standard operating procedure and policy for weeks on end until President Carol Folt – in response to public pressure rather than the Trustees - belatedly made the decision to call in the LAPD. As alleged herein, Jews were told to stay in their dorms or offices if they did not like it or could not tolerate it. USC aided, abetted, encouraged, tolerated, and implemented as policy the Terrorist Mob's "Jew Exclusion Zone." Under any legal theory, USC's reprehensible conduct is actionable and should not be tolerated by society or this Court.

16. As alleged in this SAC and implied in all pleadings previously filed herein, the individual

1  Plaintiffs as well as the two putative "subclasses" (Jewish USC students and Jewish USC faculty

2  members) assert that they have sincerely held religious beliefs and obligations to support the

3  Jewish state of Israel.  Thus, unlike the legacy media and far left-leaning radical Hamas

4  supporting mobs like the Terrorist Mob complained about herein who commandeered the Jew

5  Exclusion Zone, trespassed and took over public USC property during April – May 2024 (and

6  still continuing to this day, as alleged hereinbelow) -- Plaintiffs see no real distinction between

7  general "antisemitism" and "anti-Zionism."  It is hatred of Jews by any name.  USC not only

8  condones such hatred it sponsors it.

9     17. USC has taken no remedial action whatsoever against the thugs who created the Jew

10  Exclusion Zone, or any actions against the Terrorist Mob alleged herein.   USC has not expelled

11  nor barred from the USC campus the local divisions of JVP and JFP, despite knowledge that they

12  support and are sponsored and funded by Hamas, Hamas supporters and other known and now

13  publicly designated "terrorist groups."

14     18. While violent protests at USC have been reduced since the LAPD belatedly intervened

15  in May 2024, USC has not disavowed anything that occurred and has not made any policy

16  changes or done anything to assuage Plaintiffs concerns that some Jewish students or faculty may

17  be excluded from USC's ordinarily available programs, activities, and campus areas based on

18  their sincerely held religious beliefs should other "Jew Exclusion Zones" or exclusionary

19  encampments return.  Conversely, USC has not stated anywhere publicly or otherwise that it will

20  not provide ordinarily available programs, activities, and campus areas to non-Jewish students if

21  protesters return and exclude Jewish students.  Courts consider a party's failure to disavow

22  "unconstitutional acts" as a factor in favor of finding standing and the likelihood of imminent

23  likelihood of future injury justifying injunctive relief. *Bland v. Fessler*, 83 F.3d 729, 737 (9th

24  Cirt. 1986).   USC has done nothing to minimize the risk that Plaintiffs will again be wronged by

25  their exclusion from USC's ordinarily available programs, activities, and campus areas based on

26  their sincerely held religious beliefs.  Accordingly, injunctive relief is necessary and appropriate

27  at this time to remedy and combat USC's wrongs and future wrongs and to force USC to institute

28  policies that include actions to prevent future wrongs and protect Jewish students and professors.

19. This local action was originally filed in the Los Angeles County Superior Court seeking remedies under California State law as opposed to federal law for the purpose of avoiding removal and a contentious battle with USC in federal court. As a result, claims arising under 42 USC sections 1983 and 1985 and other federal laws were purposely not pleaded by Plaintiffs so that Plaintiffs could avoid removal to federal court. Despite Plaintiffs' intention to litigate their claims in the Los Angeles Superior Court and to treat this case as the "local controversy" that Plaintiffs contend that it is, USC removed the action to federal court anyway under CAFA on or about July 8, 2024 and filed concurrently therewith a motion to dismiss Plaintiffs' state law claims ("MTD"). Seven months later, the Court affirmed the removal and on March 4, 2025 granted USC's MTD, giving Plaintiffs 14 days leave to amend. The Court subsequently denied Plaintiffs' request on an expedited basis to add claims arising under federal law - namely, Plaintiffs' claims arising under 42 USC sections 1983 and 1985. The Court did not reject Plaintiffs' request on the merits but only stated that Plaintiffs would need to file a noticed motion for leave to amend in order to assert their federal civil rights claims.

20. While the allegations in the SAC and original pleading clearly support claims under federal law and Plaintiffs' request to USC was not asking it to stipulate to the viability of such claims, USC refused Plaintiffs' request to consent or stipulate to adding these federal claims to the SAC without the necessity of filing a motion. Simply stated, Plaintiffs were not asking USC for anything more than to avoid the cost, time, expense and stress to Plaintiffs in filing the motion for leave to amend. Accordingly, Plaintiffs contend that USC's unreasonable refusal to agree to Plaintiffs' reasonable request to force the filing of a motion to amend further evidences their anti-Jewish sentiment and animus against Plaintiffs and their claims in particular and Jewish students and faculty generally. In light of USC's refusal to stipulate to the amendment, Plaintiffs are concurrently with this filing also filing a motion seeking leave to amend this SAC to include federal civil rights claims, including claims arising under 42 USC sections 1983 and 1985.

21. Regrettably, violent "protests" by the same Campus Terrorists who created the Jew Exclusion Zone and their supporters are currently ongoing on campus and directly adjacent to USC. While the ongoing activity does not appear to include the same religious-belief-based

exclusion zone as the prior encampment that gave rise to USC's Jew Exclusion Zone and Plaintiffs' free exercise concerns, there is an imminent risk that such exclusion will return with USC's vast population of students, staff, faculty and non-USC community members.  Given the risk that protests will return to USC that will again restrict certain Jewish students and faculty members from accessing ordinarily available programs, activities, and campus areas, Plaintiffs are likely to suffer an irreparable injury absent a preliminary and permanent injunction against USC's continued antisemitic behavior.

22. In summary, USC made available certain of its programs, activities, and campus areas when certain students and faculty, including Plaintiffs, were excluded because of their genuinely held religious beliefs.   For example, Plaintiff DOE Faculty Member 2004 was accosted in the public square outside of the encampment by thugs shouting violent chants of "death to Jews," "death to Israel," "death to America, and denied access by demands to disavow the faculty member is a "Zionist" and did not support the "Israeli death war machine."  Plaintiff student - who uses the USC campus to study - faced the same type of violent harassment in order gain access to the public areas of the USC campus that non-Jewish students were given full access to.  Given that violent protests will return to USC's campus that will again restrict certain Jewish students and faculty members access to ordinarily available programs, activities, and campus areas, Plaintiffs are likely to suffer an irreparable injury absent a preliminary injunction.

23. Plaintiffs seek an injunction that requires, in part, that if any part of USC's ordinarily available programs, activities, and campus areas become unavailable to certain Jewish students or faculty, USC must stop providing those ordinarily available programs, activities, and campus areas to any students and faculty.  This is the same injunction that the Court issued in *Frankel*.

24. Plaintiffs submit that USC's conduct alleged herein and below is even more reprehensible than the offensive conduct by UCLA in this clearly "related" case under Local Rule 83.  Since this case arises out of a virtually identical set of facts, transactions and circumstances, the Court should issue a similar injunction.

25. While violent protests at USC have been reduced since the LAPD belatedly intervened in May 2024, USC has not disavowed anything that occurred and has not made any policy

changes or done anything to assuage Plaintiffs concerns that some Jewish students or faculty may be excluded from USC's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs should other "Jew Exclusion Zones" or exclusionary encampments return.  Conversely, USC has not stated anywhere publicly or otherwise that it will not provide ordinarily available programs, activities, and campus areas to non-Jewish students if protesters return and exclude Jewish students.  Courts consider a party's failure to disavow "unconstitutional acts" as a factor in favor of finding standing and the likelihood of imminent likelihood of future injury justifying injunctive relief. *Bland v. Fessler*, 83 F.3d 729, 737 (9th Cirt. 1986).   USC has done nothing to minimize the risk that Plaintiffs will again be wronged by their exclusion from USC's ordinarily available programs, activities, and campus areas based on their sincerely held religious beliefs.  Accordingly, declaratory and injunctive relief is necessary and appropriate at this time to remedy and combat USC's wrongs and future wrongs and to force USC to institute policies that include actions to prevent future wrongs and protect Jewish students and professors.  USC's refusal to permit Plaintiffs to amend the SAC to include federal claims under 42 USC sections 1983 and 1985 speaks volumes and corroborates that USC has no interest or intention in remedying these past or future wrongs.  This fact is further evidenced by the Task Force's recently announced investigation as well as USC's past remedial action of demanding that Jewish students and faculty remain in their dorms or offices to avoid the Jew Exclusion Zone. and permanent injunction against USC's continued antisemitic behavior.

26. Plaintiffs have filed concurrently herewith a Motion for Leave to File a Third Amended Complaint ("TAC") that seeks to assert additional claims under 42 USC sections 1983 and 1985, without prejudice to USC's right and ability to challenge Plaintiffs' claims.  Plaintiffs are hopeful that USC will grant Plaintiffs' reasonable request to assert and allege such federal claims now that the Court's federal jurisdiction has been established.

## STATEMENT OF THE CASE

27. Plaintiffs incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 26 of this SAC as if fully set forth at length herein.

28. Defendant the University of Southern California ("USC"), once considered among the

most prestigious public institutions in the world, has deteriorated into a hotbed of anti-Semitism, confirming for the public that USC's well-known historical antisemitism has not abated at all. This rampant anti-Jewish environment burst into view on October eight, 2023, the day after Hamas terrorists attacked Israel in a harrowing rampage that saw over 1000 innocent Jews, including infants and the elderly, murdered, raped, and mutilated..

29. In the wake of these horrifying events, USC should have taken steps to ensure that its Jewish students and faculty were safe and protected from harassment and undeterred in obtaining full access to campus facilities. Instead, USC officials routinely turned their backs on Jewish students and faculty, aiding and abetting a culture that has allowed calls for the annihilation of the Jewish people, Nazi symbolism, and religious slurs to go unchecked and unabated.  During the siege by the Campus Terrorists and creation of the "Jew Exclusion Zone," USC went so far as to tolerate Nazi swastikas that Jew-haters sprayed on USC property.  (A true and correct copy of a color photograph of a swastika on a USC entry gate taken by one of the Plaintiffs during the siege and occupation of USC is attached hereto as Exhibit "D") and incorporated herein by this reference).

30. Matters turned especially ugly the following spring.

31. In the Spring of 2024 -- fearful of demonstrations that had sprung up at other campuses, including Columbia, NYU, George Washington University and other East Coast repercussions from "diversity and equity" leaders and the cutting off of university funding by the Hamas-supporting Biden Administration -- the Trustees of the University of Southern California ("USC") (collectively "Defendant University" or "USC") decided to enact an "appeasement policy" to deal with the problem and invited, encouraged, aided, abetted, permitted, allowed, and subsequently negotiated with, enabled and coddled the violent sword and other weapon-wielding, Jew-hating Hamas-supporting terrorist antisemites (the "Campus Terrorists") who infiltrated and overtook its Los Angeles campus, setting up tents and occupying USC's common areas and other property under the Defendant University's watchful eyes.

32. USC was aware of the hatred in encampments springing up at other campuses and the

pattern and practice devised by outside agitators that followed a pattern and practice of division and havoc sowed by outside organizations and attitudes, including JFP, JVP and other antisemitic organizations that are now considered to be aligned with antisemitic and anti-America terrorist groups – including most recently Hamas - that have offices on USC's campus.  These Hamas sponsored (and funded) organizations also regularly participate in USC sponsored activities and promulgate antisemitic material via USC's official internet channel.  (True and correct copies of examples affirming USC's sponsorship of such activities are attached hereto as Exhibit "E").

33. Starting in late April 2024 and continuing several days into May 2024, USC invited, permitted, coddled and allowed, through an adopted "appeasement policy," of allowing a group of "activists" – antisemitic thugs by any other definition -  to set up barricades in the center of campus and establish an encampment that blocked access to critical educational infrastructure on campus.   (These "activists" are referred to periodically herein as the "Campus Terrorists")

34. The Campus Terrorists chanted anti-Semitic threats like "death to the Jews," "free Palestine from the hand of Jews," "from the river to the sea, Palestine will be free," proudly trumpeting their hatred of the Jewish people. But their actions went well beyond such chants or even the pretense of "free speech" or "peaceful protests."

35. With the knowledge and acquiescence of USC officials, the campus terrorists enforced what was effectively a "Jew Exclusion Zone," segregating Jewish students and preventing them from accessing the part of campus including classroom buildings and the main undergraduate library.   (The "Jew Exclusion Zone" is sometimes alternately referred to herein as the "Encampment."  In many cases, the Campus Terrorists set up barriers and locked arms together preventing those who refused to disavow Israel from passing through.  (A true and correct photographic depiction of the "Jew Exclusion Zone" is attached hereto as Exhibit "A").

36. To enter the Jew Exclusion Zone, a person had to make a statement pledging their allegiance to the Campus Terrorists' views. While this may have prevented a pro-Israel Christian from entering the zone and permitted access for a Jewish person willing to comply with the enforcers' demands, given the centrality of Jerusalem to the Jewish faith (see allegations below),

1    the practical effect was to deny the overwhelming majority of Jews access to the heart of the

2    campus.

3        37. The campus terrorists permitted passage to those who passed this Orwellian inquisition.

4        38. USC's administration knew about the Campus Terrorists' extreme actions, including the

5    exclusion of Jews. But in a remarkable display of cowardice, appeasement, encouragement and

6    illegality, the administration did nothing to stop it. USC chancellor president Carol Folt publicly

7    acknowledged that students had been physically blocked from accessing parts of the campus but

8    failed to call in LAPD until public outcry demanded it.

9        39. Yet even as the activists campus terrorists continued to enforce the Jew Exclusion Zone,

10   USC not only failed to marshal resources to intervene - it adopted a policy of facilitating the Jew

11   Exclusion Zone, ordering, among other things, USC campus police and security to stand down,

12   step aside and appease the Campus Terrorists.

13       40. Rather than instructing campus police and security to assist Jewish students in accessing

14   campus resources, USC instead instructed them to discourage unapproved students from

15   attempting to cross through the Encampment and other areas blocked by the Campus Terrorists.

16       41. The administration coddled the Campus Terrorists by providing them with megaphones,

17   food, water bottles and other necessities of life so they could carry on with their reign of terrorism

18   against Jewish Students and Faculty.  The water bottles were subsequently used as weapons

19   against any Jews seeking to enter the public buildings including within the Jew Exclusion Zone.

20       42. All told, the Jew Exclusion Zone existed on campus for countless days and what seemed

21   to be an eternity to Jewish students and faculty used to enjoying the benefits of a campus free

22   from terrorism against Jews, wreaking havoc on the lives of Jewish students who were and are

23   simply trying to attend classes and study for exams and Jewish faculty who were trying to grade

24   exams.

25       43. As more particularly set forth in this SAC, each of the individual Plaintiffs was

26   prevented from passing through the Jew Exclusion Zone during the existence of the Encampment,

27   not to mention the exclusion of all of the Jewish students and faculty in the subclasses.

28       44. USC boasts of its open inclusive environment that nurtures the growth and development

of all faculty, students, administration and staff and assures students that it does not tolerate acts of discrimination, harassment or conduct causing harm to individuals on the basis of race, color, ethnicity, citizenship national origin, or religious beliefs. USC also has a number of policies that purport to implement these guarantees. But USC has failed to provide Jewish students, faculty, and staff with the protection promised by such policies. Needless to say, Jews should not fear for their safety when they walk around any public space, let alone the campus of a prominent American research university.

45. Yet here we are. The administration's cowardly abdication of its duty to ensure unfettered access to USC's educational opportunities and to protect the Jewish community is not only immoral - it is illegal.

46. Specifically, it violates numerous federal and state constitutional guarantees, including the equal protection clause, the free exercise clause and the freedom of speech.

47. And it contravenes the basic guarantee of equal access to educational facilities that receive federal funding, as well as numerous other statutory guarantees of equality and fair treatment

48. Plaintiffs need immediate injunctive relief to ensure that neither they nor any other Jew will again suffer from the discrimination and indignity they have endured. And because the administrators at USC took actions (or did nothing) which amounts to sanctioning segregation, they are clearly unconstitutional actions entitling Plaintiffs to hold the school's administrators personally liable for their reprehensible failures. Plaintiffs will seek leave to amend this complaint pending discovery to name these individuals as defendants.

49. In 1790, George Washington wrote to the Hebrew congregation of Newport, Rhode Island (which sought assurances about the place of Jews within American Society): "May the children of the stock of Abraham, who dwell in this land, continue to merit and enjoy the goodwill of the other Inhabitants; While everyone shall sit in safety under his own vine and victory, and there shall be none to make him afraid" (Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), in Founders Online, National Archives, https://perma.cc/VUR8-G3BC).

50. USC treated Jews disparately and discriminated against them. As a result, Plaintiffs

received a different educational experience than other USC students while elevating the Hamas leaning Campus Terrorists to "heroes" under the guise of "protecting free speech." USC's treatment of Jews and acquiescence to the Jew Exclusion Zones is repugnant to civilized society.

51. The Campus Terrorists' intent and the avowed purpose of the Encampment – clear to most reasonable persons with common sense - was to create and sow division through acts of disruption, chaos and dissension on the Defendant University's campus. Among other things, the Campus Terrorists sought to and in fact did disrupt classes, overtook University buildings and property, and most importantly, terrorized and victimized blameless Jewish Students and Faculty in a rein of terror under the hoax, guise, and "cover" of engaging in peaceful protests to support fictitious victims of the Israeli government's alleged "Palestinian Genocide." The hoax was enabled by and perpetrated under the Defendant University's watchful eyes to such an extent that the Jewish Students and Faculty were so fearful for their lives and safety that they could not appear in the Defendant University's "town square" or anywhere else on campus without being verbally or physically assaulted by the Campus Terrorists, as well as the Campus Terrorists' student supporters lulled in by the false sense of security afforded to them by the Defendant University's "appeasement" policy of coddling the Campus Terrorists. Jewish Students and Faculty were touched without their consent and spat on by the Campus Terrorists if they dared to cross into the Encampment. Their fear was and still is genuine and palpable. The fear was and is made worse by the Defendant University's encouragement of the offensive conduct for weeks on end before finally taking steps of remediation.

52. Alternatively, Jewish Students and Faculty were told by the Defendant University to work remotely from home, or remain in their offices or dorms for their "own safety." Classes and commencement exercises were cancelled as the Defendant University continued to appease, coddle and negotiate with the Campus Terrorists. Jewish Students and Faculty, (including the Plaintiffs herein) were not allowed to attend classes as usual or give lectures or grade papers on site and could not walk safely to class or their offices on campus without being assaulted by the Campus Terrorists. (See **Exhibit "A"**)

53. Meanwhile, other Hamas-leaning and supporting faculty members hired by Defendant

1   University to abide by DEI and other quotas continued to encourage students attending classes to

2   participate in the chaos and disruption created by the Campus Terrorists by offering such students

3   extra credit and better grades for participating, all with the knowledge and consent of the

4   Defendant University.

5       54. Plaintiffs are regularly exposed to pro Hamas propaganda and posters "calling all students,

6   faculty and staff to "attend" pro Hamas rallies on USC campus property, such as Bovard Hall.

7   These "Pro- Hamas" rallies, endangering plaintiffs, Jewish students and Jewish professors and

8   faculty, are encouraged by and acquiesced to by Defendant university.

9       55. At all times herein mentioned, the Defendant University also knew or should have known

10  that nearly half of the Campus Terrorists creating, managing and equipping the Encampment and

11  causing the harm to Jewish Students and Faculty, creating the chaos and disruption and

12  overtaking the Defendant University's buildings and property, were and still are in fact paid

13  outside agitators rather than genuine students attending classes at the Defendant University who

14  were and are instigated and funded by wealthy Democrat Party donors and radical Democrat Left

15  Wing political action groups, including the Rockefeller Brothers Fund, Tides Center, Soros

16  Foundation and Popular Front for the Liberation of Palestine ("PFLP"), all done under the

17  Defendant University's watchful eye.  (New York Post, various articles, April – May 2024).

18      56. Far from "peaceful protests" and the "free speech" narrative promulgated by the

19  Democratic Party-controlled media, Democrat congressmen and the Democrat Party itself, the

20  dangerous hate-filled, violent, and antisemitic speech included rote comments repeated ad

21  nauseum through megaphones that were so offensive to any Jew that it offends them to hear it,

22  eliciting memories of the Holocaust and October 7, 2023 – slogans that include "Death to Israel"

23  (the only *Jewish* nation state in the world and a common refrain of Iranian fanatics and their

24  proxies), and not surprisingly, "Death to America."  Violent, hate-filled speech is not only

25  offensive and hurtful, it is dangerous and not protected by the First Amendment.

26      57. Defendant knew about the antisemitic nature of these alleged student groups yet

27

28

encouraged them by providing offices on campus and soliciting funding on their behalf from the United States under USAID and other agencies that the Trump Administration's "DOGE" unit recently found was riffled with fraud, waste and abuse.

58. The purpose and intent of the Campus Terrorists was not to peacefully protest but to terrorize, intimidate, assault, and shame Jewish Students and Faculty members and interfere with their right to freely travel to and from classes, offices, and otherwise accessing other facilities at the Defendant University by threats, intimidation, and coercion.  All of this was done to harm Jewish Students and Faculty members and create the equivalent of a hostile work and educational environment, ***with the knowledge, consent, encouragement and blessings of the Defendant University***.

59. USC knew that soliciting and inviting radical left-leaning Jew-hating professors and lecturers to campus would create chaos, dissention and the violence and harm that in fact occurred.

60. USC allowed Anti-Semitic organizations to use its professional platforms and e-mail addresses to spew Jew-hating anti-Zionist Hamas propaganda that USC knew or certainly should have known would incite chaos, violence and property destruction that occurred on campus.

61. The Campus Terrorists' purpose was encouraged, and aided and abetted by the Defendant University.  The Defendant University invited Hamas-supporting groups to speak at USC notwithstanding the rampant antisemitism spewed by such groups; encouraged Hamas-leaning and -supporting faculty members to spew antisemitism and hatred of Jews and the State of Israel, the only Jewish country in the world.

62. Defendant University allowed the Campus Terrorists to continue their anti-Semitic campaign against the Defendant University's large Jewish student body and faculty unabated until April 24, 2024, when the Defendant University finally allowed the Los Angeles Police Department ("LAPD") to clear the Encampment and arrest 93 people on suspicion of trespassing, reporting publicly that nearly half of the arrested mob members were not students attending USC at all but rather paid and monied agitators funded by the democratic dark-money political action groups identified herein above.

18

63.  None of the offending students, Campus Terrorists, paid outside agitators or other responsible parties, arrested or otherwise, suffered any consequences.  Despite Defendant University's belated call for the LAPD's belated intervention and the subsequent arrest of certain parties, the offending Campus Terrorists were all released without bail to launch their attack again, spurred on by outside agitators funded by the Rockefeller Center and other Jew-hating organizations, such as Tides and George Soros.   And the Defendant University has refused to press charges or discipline offending students or faculty members, allowing antisemitism to exist, fester and continue like a malignant cancer and spread throughout the Defendant University's campus even after removal of the Jew Exclusion Zone.  For example, as of May 7, 2024, Hamas-supporting protests were continuing at the Defendant University's campus, under the administration's watchful eyes, with Palestinian flags and students or outside supporters, sporting Palestinian flags and other terrorist garb, including green Hamas headbands, sunglasses and the traditional Keffiyeh – and of course, black and white Hamas facemasks and scarves to hide the Campus Terrorists' identities.  It is common knowledge that hiding identities is a hallmark of terrorists and terrorism.

64. After the Jew Exclusion Zone was removed, students and outside vendors were allowed to continue to send emails on University sponsored or permitted internet platforms to promulgate Hamas and terrorist propaganda and flyers against Jews, Jewish students and Faculty to encourage gullible students, faculty and other supporters to purchase Keffiyehs to wear and display at individual department graduation ceremonies, all with the knowledge and encouragement of the Defendant University.  (Examples of such flyers and propaganda are attached hereto as Exhibit "B" and incorporated herein by this reference).

65. As of the filing of this SAC, the Palestinian flag is still proudly displayed virtually anywhere on campus by Keffiyeh and mask-wearing thugs, within sight of Figueroa Street, aided and abetted by the Campus Terrorists with the knowledge, consent and encouragement of USC.

66. The Defendant University, one of America's leading universities, has for decades been one of the worst centers of academic anti-Semitism in the United States. Since October 7, 2023, when Hamas terrorists invaded Israel and slaughtered, tortured, raped, burned, and mutilated

1200 people – including infants, children, and the elderly – anti-Semitism at Defendant University has been particularly severe and pervasive. Defendant University faculty and students have openly lauded Hamas' October 7 atrocities as astounding, awesome, and great feats. Mobs of pro-Hamas students and faculty have marched by the hundreds to Defendant University's campus shouting antisemitic slogans, including calls for genocide, such as: Jews will not defeat us; there is only one solution, intifada revolution; we will honor our martyrs; resistance is justified; by any means necessary; from the river to the sea and in Arabic, from water to water Galilee will be Arab.

~~67.~~ These mobs have occupied Defendant University's buildings, promoted violence against and restricted access to Jewish Students and Faculty members, caused cancellation of classes and commencement exercises, and harassed and assaulted Jewish Students and Faculty members on campus.

68. Jewish Students and Faculty members have been spat at and faculty physically assaulted, threatened and targeted on campus and social media with epitaphs such as death to Jews. Defendant University has helped promulgate antisemitism in its courses and dismissed and intimidated students who object. What is most striking about all of this is Defendant University's abject failure and deliberate refusal to act to stop and deter this outrageous antisemitic conduct and discipline the students and faculty who perpetrated it.  In fact, the Defendant University encouraged the conduct by its appeasement policy in the face of hate speech, dangerous misconduct in other actions that it knew or should have known would create the worst and most insidious hostile antisemitic work environment.

69. The Defendant University's antisemitism manifests itself in a double standard insidious to Jewish Students and Faculty members. Defendant University selectively enforces its policies to avoid protecting Jewish Students and Faculty members from harassment, hires professors who support anti-Jewish violence and spread antisemitic propaganda, and ignores Jewish Students and Faculty pleas for protection. Defendant University permits students and faculty to advocate without consequence, the murder of Jews and the destruction of Israel, the only Jewish country in the world.

70. Plaintiffs and other similarly situated Jewish Student and Faculty members, and numerous others have explicitly and repeatedly warned Defendant University that its severe and pervasive hostile anti-Semitic environment harms Jewish Students and Faculty members. In fact, Defendant University has been aware of its anti-Semitism problem for years, but its response has been utterly ineffective and clearly unreasonable in tolerating and even enabling antisemitism. Defendant University has abjectly failed to enforce its policies and discipline those responsible for turning USC campus into a severely hostile environment for its Jewish Students and Faculty members, including the Individual Plaintiffs and other similarly situated Jewish Student and Faculty members.  When, in clear violation of Defendant University's policies, a mob of students overtook a campus building to further their antisemitic agenda, Defendant University's response was not to remove and discipline them, but to enable them to conceal their identities by supplying them with supplies and ammunition that the mob subsequently used against LAPD.

71. Defendant University's longtime practice when it comes to antisemitism—of refusing to enforce its own policies against discrimination and harassment—ensured that Hamas' October 7 terrorist attack would enormously intensify the anti-Jewish abuse on campus. Shockingly, numerous students and faculty members at Defendant University have openly endorsed Hamas and the horrific October 7 massacre of Israelis it perpetrated even though: Hamas, since its founding in 1987, has perpetrated numerous suicide bombings and other terrorist attacks against civilians; Hamas vows to kill and destroy Jews and Israel; the U.S. State Department has designated Hamas as a Foreign Terrorist Organization; and Hamas repeatedly proclaims its determination to repeat the October 7 atrocities until its genocidal aims are achieved. Many of Defendant University's students and faculty support Hamas and condemn Israel for defending itself against Hamas' terrorist attacks—but they are never heard to condemn, let alone rally against, anyone other than Israel and the Jews.

72. Subjected to intense anti-Jewish vitriol, including from their own professors and Defendant University, the Individual Plaintiffs and other Jewish Students and Faculty members have been deprived of the ability and opportunity to fully participate in Defendant University's educational and other programs and have been placed at severe emotional and physical risk.

Defendant University's double standard extends to depriving Jewish Students and Faculty members equal time to express contrasting pro-Jewish views. More importantly, Jewish Students and Faculty are terrified about disclosing their pro-Israel stance for fear of violence or worse.

73. In short, Defendant University has permitted endemic antisemitism to exclude Jewish Students and Faculty members from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at Defendant University, and has insidiously discriminated against them by, among other things, failing to protect them in the same way Defendant University has protected other groups all based on their race, ethnicity, religion, citizenship, and/or national origin. That Defendant University has done so for many years and continues to do so to this day further confirms that it has responded to antisemitism with at best deliberate indifference, that Defendant University cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

74. As alleged herein, Defendant University's actions, including its deliberate indifference to, and indeed enabling of, anti-Semitism on its campus, constitute an egregious violation of California's Bane, Unruh, and Ralph Civil Rights Acts (California Civil Code sections 51, 52.1 and 51.7) and created and continue to create a dangerous condition of public property. The "Jew Exclusion Zone" and continued antisemitism on USC's campus also violates federal civil rights laws, including 42 USC Sections 1983 and 1985. Plaintiffs are filing a motion for leave to file a Third Amended Complaint to assert their federal claims concurrently with the filing of this SAC because USC refused to stipulate to permit such claims without leave of Court.

75. Defendant University must now be compelled to implement institutional, far-reaching, and concrete remedial measures. Defendant University must also pay damages to Plaintiffs—who have been robbed of a healthy and safe college and graduate school experience. The Plaintiff Faculty member and subclass were also deprived of the opportunity to work in an environment free of hostility toward Jews. Regrettably, no amount of damages can ever fully compensate Plaintiffs for the hostility they have been forced to endure as a consequence of Defendant University's unlawful conduct.

76. Defendant University's administration exported their inadequate management skills and

1  style, including appeasing, enabling, encouraging, aiding, abetting, coddling and negotiating with

2  the Campus Terrorists and allowing the Campus Terrorists to repeatedly build and rebuild the

3  encampments to terrorize Jewish Students and Faculty.  USC continues to encourage and enable

4  the Campus Terrorists to this day.

5      77. Pro-Hamas and Pro-Palestinian demonstrations continue to spread to California campuses,

6  including USC, and little has been done since the LAPD's removal of the Encampment to .

7

8  ## INTRODUCTION AND FACTS RELEVANT TO ALL CLAIMS

9      78. Plaintiffs incorporate herein by this reference each and every fact alleged herein above

10     79. In the spring of 2024 - fearful of demonstration sprouting up at other campuses,

11  repercussions from "diversity, inclusion and equity" ("DEI") leaders and the cutting off of USC's

12  public funding from the Hamas - supporting Biden administration (which was taking heat from

13  the public as a result of the October 7, 2023 Israeli Massacre) - the trustees of the University of

14  Southern California (" USC" or "Defendant University") invited, encouraged, aided, abetted,

15  permitted, allowed, and subsequently appeased, enabled and negotiated with violent sword and

16  other weapon-wielding, Jew hating Hamas supporting, antisemitic  campus terrorists (hereinafter

17  sometimes referred to as the "Campus Terrorists") who infiltrated and overtook its Los Angeles

18  campus (the "Encampment" or "Jew Exclusion Zone"), setting up tents and trespassing,

19  occupying, denying access to and damaging USC property – all under the Defendant University's

20  watchful eyes.  (See Exhibit "A" hereto which is incorporated herein by this reference).

21     80. The Campus Terrorists' intent and the avowed purpose of the Encampment or "Jew

22  Exclusion Zone" - clear to most reasonable persons with common sense - was to create and sow

23  division through acts of disruption, chaos, segregation and dissension on the defendant

24  University's campus. Among other things, the Campus Terrorists sought to and in fact did disrupt

25  classes, overtook USC buildings and property, and most importantly, terrorized and victimized

26  blameless Jewish students and Faculty members in a reign of terror under the hoax, guise and

27  "cover" of engaging in peaceful protest activity to support fictitious victims of the Israeli

28  Government's alleged "Palestinian Genocide."  While Hamas has been designated and declared a

"terrorist group" since October 1997, the Palestinian Genocide hoax and the protestors' casting of blame on all Jews was aided and abetted by USC's appeasement of the Hamas-supporting leaning groups that were perpetrating what was in essence an "occupation" of USC's "Town Square." This occupation took place under the Defendant University's watchful eyes. Plaintiffs were so fearful for their lives and safety that they could not appear in the Defendant University's Town Square or anywhere else on USC's campus without being verbally or physically assaulted by the Campus Terrorists, as well as their student supporters, lulled in by the false sense of security afforded to them by the Defendant University's appeasement policy of coddling, encouraging and negotiating with the Campus Terrorists. In short, Plaintiffs were excluded from or denied access to the area of the Jew Exclusion Zone that they were formerly allowed to transverse because they were Jewish unless they disavowed Zionism, as set forth herein. Plaintiffs were touched without their consent and spat on by the campus terrorists if they dared to cross into the Encampment. Their fear was and still is genuine and palpable. The fear was and is made worse by the Defendant University's encouragement of the offensive conduct for weeks on end before finally taking steps of remediation.

81. Alternatively, Plaintiffs Jewish Students and Faculty were told by the Defendant University to work remotely from home or remain in their offices or dorms for their "own safety." Classes and commencement exercises were cancelled as the Defendant University continued to appease, coddle and negotiate with the Campus Terrorists. Plaintiffs were not allowed to attend classes as usual or give lectures or grade papers on site as usual and could not walk safely to class or their offices on campus without being going through the Encampment and being assaulted and accosted by the Campus Terrorists. (See photo of Jew Exclusion Zone attached hereto as Exhibit "A"). Meanwhile, other Hamas leaning and supporting faculty members hired by defendant university to abide by DEI quotas continued to encourage students attending classes to participate in the chaos and disruption created by the Campus Terrorists by offering such students extra credit and better grades for participating, all with the knowledge and consent of the Defendant University. Plaintiffs are regularly exposed to pro Hamas propaganda and posters sent on USC's official "edu." internet platform "calling all students, faculty and staff"

to attend pro Hamas rallies on USC campus property such as Bovard Hall.  These pro Hamas rallies clearly endanger Plaintiffs and other Jews who visibly practice their religion, such as wearing a Jewish Star or skull cap.  These pro-Hamas rallies are encouraged by and acquiesced to by Defendant University.  (True and correct copies of flyers promulgating pro-Hamas propaganda that was received by one of the named Plaintiffs during the relevant time period via USC's internet platform is attached hereto as Exhibit " D").

82. At all times herein mentioned, the Defendant University also knew that nearly half of the Campus Terrorists creating, managing and equipping the encampment or Jew Exclusion Zone, causing the harm to Jewish students and faculty, creating the chaos and disruption and overtaking the Defendant University's buildings and property - were and still are paid outside agitators rather than genuine students attending classes at the Defendant University who were and are instigated and funded by wealthy Democratic Party donors and radical Democratic Party left wing political action groups, including the Rockefeller Brothers Fund, Tides Center, Soros Foundation and Popular Front of the Liberation of Palestine ("PFLP").  (*New York Post*, various articles, April – May 2024).  To make matters worse, the Trump Administration recently disclosed and announced that taxpayer money to USAID – a federal agency whose funding was recently cut by the "Department of Government Efficiency" ("DOGE") - funded many of the alleged "peaceful protests" that led to the Jew Exclusion Zone at USC, including funds received by organizations with offices on campus such as JFP and JVP.

83. Far from "peaceful protests" and the "free speech" narrative promulgated by the Democratic Party controlled "Legacy Media," Democratic Congressmen and the Democratic Party itself, the dangerous hate-filled, violent and anti-Semitic speech that USC condoned and allowed included rote slurs against Jews repeated ad nauseam through megaphones (provided by USC) that were so offensive to any Jew that it offends them to hear it, let alone to hear the words published again on the evening news.   Such words elicit memories of the Holocaust and October 7, 2023 - slogans that include "death to Israel" (the only *Jewish* nation state in the world and a common refrain of Iranian fanatics and their proxies), and not surprisingly, "death to America").  Violent, hate-filled speech or speech inciting harm, death or violence is not only offensive and

hurtful, it is dangerous, illegal and not protected by the First Amendment. USC knew this yet aided and abetted the Campus Terrorists, allowing the Encampment to remain for weeks before calling in the LAPD to remove it.

84. The Campus Terrorists' purpose and intent was not to "peacefully protest" but rather to terrorize, intimidate assault and shame Jewish students and faculty members and interfere with their right to freely travel to and from classes, offices, and otherwise accessing other facilities at the Defendant University by threats, intimidation and coercion. USC knew this was ongoing and tolerated the conduct, doing nothing to stop it, aiding and abetting the Campus Terrorists by negotiating with them and exercising what can best be described as an "appeasement" policy. USC further aided and abetted the Campus Terrorists by stonewalling any intervention, providing them with food, water bottles and other items used as projectiles and other acts of encouragement, effectively "standing down" to the Campus Terrorists. The Campus Terrorists harmed Plaintiffs with their, occupation, Jew Exclusion Zone and other acts to intimidate Jews and were encouraged and invited to continue on with the occupation for weeks by USC and its policy of appeasement. USC aided and abetted the Campus Terrorists by creating and encouraging the equivalent of a hostile work environment, giving its blessings and allowing it to continue and fester for weeks on end.

85. The Campus Terrorists' purpose and intent was encouraged and aided and abetted by the Defendant University. Among other things, the Defendant University invited Hamas-supporting groups to speak at USC notwithstanding Hamas's designation as a terrorist group by the United States Government since October 1997 and the rampant anti-Semitism spewed by such groups; encouraged Hamas leaning and supporting faculty members to spew and promulgate anti-Semitism and hatred of Jews at the state of Israel - the only Jewish country in the world. As alleged herein, the State of Israel and support for Israel is important to Plaintiffs' religious beliefs, some of whom have families with Holocaust survivors. USC's appeasement further permitted, aided, abetted and encouraged the Campus Terrorists and/or their supporters to paint swastikas and other painfully offensive and hurtful comments on USC property during the occupation. (See photo of swastika on USC property attached hereto as Exhibit " E "). Rather than punish or

even chastise those responsible for these antisemitic slurs, USC appeased and encouraged them continue by actually listening to and considering their anti-Semitic demands. (https://www.youtu.be/v7ibgdWRMkg18YB6hwmz1o).  None of the offending students, Campus Terrorists, professional paid agitators or other responsible parties - arrested or otherwise - suffered any criminal consequences.

86.  The Defendant university has refused and continues to refuse to press charges or discipline offending students and allows the anti-Semitism to fester and continue by its lame and anemic response, further enabling anti-Semitism to exist and spread through USC's campus even after the removal of the Encampment or Jew Exclusion Zone. For example, as of May 7, 2024, Hamas supporting protestors were continuing to protest violence and the eradication of Jews and Israel at the Defendant University's campus, with Palestinian flags and students or outside supporters sporting Palestinian flags and other terrorist garb, including green Hamas headbands and the traditional Keffiyeh - and of course, black and white Hamas face masks and scarves to hide the Campus Terrorists' identities.   Concealing the identities of the perpetrators is an essential element of intimidation and routinely employed by terrorists and terrorist organizations. After the encampment was removed, students and outside vendors were allowed to send emails on university sponsored or permitted to use Internet platforms to sell and encourage gullible students, faculty and other supporters to purchase keffiyehs to wear and display at individual department graduation ceremonies, all with the knowledge, consent and encouragement of the Defendant University. As of the filing of plaintiffs first amended complaint in June 2024, the Palestinian flag was still proudly displayed virtually anywhere, anytime on campus by Keffiyeh and mask-wearing thugs, within sight of Figueroa Street. aided and abetted by the Campus Terrorists and with the knowledge and consent of and continued encouragement by USC.  (See http://www.youtu.be/XqbZtOuKVVo).

87. Despite USC's belated call for LAPD's intervention, the offending campus terrorists were all released without bail to launch their attack again - spurred on by outside agitators funded by the Rockefeller Brothers, Tides, Soros Foundation and other Jew hating nonprofits and related organizations.

88. USC - one of America's leading universities - has for decades been one of the worst centers of academic anti-Semitism in the United States period since October 7, 2023, when Hamas terrorists invaded Israel and slaughtered, murdered, raped, burned, and mutilated 1200 people - including infants, children, and the elderly - anti-Semitism at USC has been particularly severe and pervasive. USC faculty and students openly lauded Hamas is October 7 atrocities as astounding, awesome, and great feats. Mobs of pro Hamas students and faculty have marched by the hundreds on USC's campus since October 7, 2023, shouting anti-Semitic slogans and calls for genocide such as: "Jews will not defeat us; There is only one solution, intifada revolution; We will honor our martyrs; Resistance is justified; By any means necessary; From the river to the sea"; and in Arabic, "from water to water Galilee will be Arab."

89. These violent antisemitic thugs and mobs have occupied USC's buildings, promoted and encouraged violence and harm against Plaintiffs, barred and restricted access to campus buildings and facilities, caused cancellation of classes and commencement exercises, harassed and assaulted Plaintiffs on campus and caused other harm to Plaintiffs as described herein.

90. Plaintiffs were spat at, physically assaulted, threatened and targeted on campus and via social media with targeted epitaphs such as "death to Jews." USC helped to promulgate anti-Semitism in its courses by inviting anti-Semitic lecturers to give lectures against the Jewish State of Israel and dismissed and intimidated students who objected. What is most striking about all of this is USC's abject failure and deliberate refusal to act to stop and deter this outrageous anti-Semitic conduct and discipline the students and faculty who perpetrated it. In fact, USC encouraged the conduct by its appeasement policy in the face of dangerous and violent hate speech and other actions created and taken by the Campus Terrorists that it knew would create the worst and most insidious hostile anti-Semitic work environment USC has ever seen on its campus. The pervasive antisemitism at USC and the administration's failure to act has become so pronounced that USC is just one of 10 college campuses that the United States Department of Justice's Antisemitism Task Force chose to investigate for its failure to combat antisemitism on campus when it announced the launching of its investigation on March 5, 2025. USC encourage

the conduct by its appeasement policy in the face of violent hate speech, dangerous misconduct as described herein and other actions that it knew would create the worst and most insidious hostile anti-Semitic work environment ever seen or experienced on campus hello.

91. USC's anti-Semitism manifests itself in a double standard insidious to Jewish students and faculty members. USC selectively enforces its policies to avoid protecting Jewish students and faculty members from harassment. For example, while USC permits students and faculty to freely advocate without consequence or responsibility for the murder of Jews and destruction of Israel - the only Jewish nation state in the world whose continued existence is of deep religious significance to the Plaintiffs herein – it ignored and continues to ignore pleas for protection from Jewish students and faculty members. USC also encourages continued antisemitism by hiring professors and lecturers who support anti-Jewish violence and hatred and see as their purpose the spread of anti-Semitic propaganda.

92. Plaintiffs and other similarly situated Jewish student and faculty members and numerous others had explicitly and repeatedly warned USC and its administration that its severe and pervasive and hostile anti-Semitic environment harms Jewish students and faculty members. In fact, USC has been aware of its anti-Semitism problem for years, but its response has been utterly ineffective and clearly unreasonable in that it continues to tolerate and enable anti-Semitism on campus by virtue of its appeasement policy. USC has objectively failed to enforce its policies and discipline those responsible for turning USC's campus into an "occupation" and "Jew Exclusion Zone" by the Campus Terrorists and created and allowed them to create a severely hostile environment for USC's Jewish students and faculty members, including the individual plaintiffs herein and other similarly situated Jewish students and faculty. When a mob of students and outside agitators overtook a campus building to further their anti-Semitic agenda, in clear violation of USC's policies, USC's response was not to remove and discipline them but rather to coddle and enable them through USC's "appeasement policy." USC also allowed the Campus Terrorists to conceal their identities by supplying them with supplies and ammunition that the mob subsequently used against Plaintiffs and the LAPD.

93. USC's longtime practice when it comes to anti-Semitism – and of refusing to enforce its own policies against discrimination and harassment - ensured that Hamas is October 7th terrorist attack would enormously intensify the anti- Jewish abuse on campus. Shockingly, numerous students and faculty members at USC have openly endorsed Hamas and the horrific October 7 massacre of Israelis it perpetrated even though:  Hamas since its founding in 1987, has perpetrated numerous suicide bombings and other terrorist attacks against civilians; Hamas vows to kill and destroy Jews in Israel; the US state department has designated Hamas as a foreign terrorist organization; and Hamas repeatedly proclaims its determination to repeat the October 7 atrocities until its genocidal aims are achieved. Many of USC students and faculty support Hamas and condemn Israel for defending itself against Hamas's terrorist attacks - but they are never heard to condemn, let alone rally against, countless other nation states.  (See "Campus chaos and anti-Israel rhetoric revceal stark failures of today's higher education") (https://www.foxnews.com/lifestyle/campus-chaos-antio-Israel-rehtoric-reveal-stark-failures-today-higher-education)).

94. Subjected to intense anti-Jewish vitriol, including from some of their own professors and USC, the individual Plaintiffs and other Jewish students and faculty members have been deprived of the ability and opportunity to fully participate in USC's educational experience and regular USC programs in violation of  Equal Protection and the First Amendment Establishment Clauses and  been placed at severe emotional and physical risk by virtue of the regular threats of violence, death and related intimidation. USC's double standard extends to depriving Jewish students and faculty members equal time to express contrasting pro Jewish viewpoints in violation of the First Amendment.

95. In short, USC has permitted endemic anti-Semitism to exclude Jewish students and faculty members from full and equal participation in - and to deprive them of - the full and equal benefits of their educational experience at USC and to practice their faith freely on campus without fear of repercussions from mobs like the Campus Terrorists. USC has invidiously discriminated against plaintiffs by failing to protect them in the same way USC has protected

other groups based on their race, ethnicity, religion, citizenship and/or national origin. That USC has done so for many years and continues to do so to this day shows deliberate indifference at best and intent to discriminate against Jews at worst.  This is confirmed by USC's anemic response to the anti-Semitic mobs who overtook USC and its buildings and the enabling of the encampment or Jew Exclusion Zone - which included de facto "passing guards" requiring Plaintiffs and other Jews to disavow Zionism before gaining access.  Pro- Hamas hate speech, symbols and rhetoric existed for weeks and flourish still on campus. Regrettably, USC cannot be left to its own devices to remedy the situation because USC's response and its appeasement policy has been clearly ineffective and unreasonable.

96. As alleged herein, USC's actions, including its deliberate indifference to and enabling of anti-Semitism on its campus and allowing the creation and maintenance of a Jew Exclusion zone for weeks on end - constitute an egregious violation of California's Bane, Unruh and Ralph Civil Rights Acts Prince California Civil Code section 51, 52.1 and 51.7.  USC's actions also created and continue to create a dangerous condition of public property, dangerous to Jews at least – on its Los Angeles campus, which was a substantial factor in bringing about the discrimination, damages, assault, battery and negligent infliction of emotional distress sustained by Plaintiffs herein.

97. USC must now be compelled to implement institutional, far reaching, and concrete remedial measures similar to the one imposed by Judge Scarsi on UCLA in the *Frankel* case. (See Exhibit "  " hereto).  USC must also pay damages to Plaintiffs, who have been robbed of their college and graduate school experience and of the right to work and study in an environment free from religious intolerance.

## THE PARTIES

98. DOE JEWISH USC FACULTY MEMBER 2004, Individually And On Behalf Of All Others Similarly Situated ("Plaintiff," "Plaintiffs" or "Jewish Professor") is and at all times herein mentioned was a Jewish professor employed by and at USC. Much like a victim of sexual abuse and assault, Jewish professor fears for Jewish professor's life, liberty, safety and health as

well as the fear of a hostile work environment caused by the filing of this lawsuit - and in particular, the risk to Jewish professor's continued employment at USC if Jewish professor's identity is publicly disclosed, or if Plaintiff is "outed" by USC disclosed to Jewish Professor's boss or USC's human resources department. Accordingly, Jewish professor is suing herein as a doe plaintiff.

99. Jewish professor is suing herein individually and on behalf of all other USC Jewish faculty members who are similarly situated.

100. The following is Jewish professor's personal diary of the highly offensive, hateful, hurtful, unequal and obnoxious conduct Jewish professor and other similarly situated Jewish professors experienced and endured and continue to experience and endure at USC as a result of the Campus Terrorists' unlawful activity and as a result of USC's aiding, abetting, encouragement, enabling, and participation in what was effectively "mob rule" at USC and the creation of encampments and the Jew Exclusion Zone:

**Before October 7, 2023**:

101. I was aware of the US Department of Education's Office for Civil Rights Title 6 investigation into allegations of anti-Semitism at USC after a Jewish student resigned from her position as student government vice president in August 2020. She was being targeted for discrimination because of her perceived Jewish identity. I was also aware of the anti-Semitic student and faculty organizations, speakers, professors, and other hate mongers USC invited on campus to lecture and allowed to flourish and grow who lectured about and were known to spread Hamas propaganda and other dogma and ideology. Among the other lies promulgated by such hateful organizations, speakers, professors and other hate mongers is their specious claim that Israel - and the Jews that inhabit only a fraction of the only democratic, multi ethnic, religious and racial Jewish nation state in the world - are "oppressors" against the "oppressed." I come from a family of Holocaust survivors and victims and as a consequence the continued existence of a Jewish nation state and the Nation of Israel are very important to my

personal religious beliefs. For my part I sees no "distinction" between antisemitism and anti-Zionism – it is Jew hating by any name.

**After October 7, 2023:**

102.     After October 7, I personally witnessed several incidents of students and other individuals removing posters of kidnapped Israeli civilians who are and were being held in hostage in Gaza.

103.     In February 2024, three student groups, including Students for Justice in Palestine ("SJP") - held a vigil for Palestine and launched a "national divestment campaign," calling on USC to divest from Israel and saying "we know that USC is very complicit in violence."

104.     I have personal knowledge that complaints have been lodged against some professors for allegedly promoting anti-Semitic and anti Zionist content online and a number of Jewish students - particularly in the law and medical schools - have also publicly reported being targeted with online harassment.

105.     The level of anti-Semitism rose to unprecedented levels in April 2024, when USC President Carol Folt announced the nomination of Muslim student Asna Tabassum ("Tabassum") as USC's 2024 valedictorian. USC knew or certainly should have known as alleged above that Tabassum's social media was replete with anti Israel propaganda and violent hate speech when an e-mail was sent out by Provost Guzman to keep her as valedictorian yet not allow her to speak. That was the turning point that led to the creation of campus anti Israel encampments and a level of open Anti-Semitic vitriol that I have never previously experienced. Encampments – the equivalent of "Jew Exclusion Zones" – sprung up all over the USC campus that required disavowing "Zionism" and/or the "Palestinian Genocide" in order to pass. (A photo of one of the "Encampments" depicting the "Jew Exclusion Zone" is attached hereto as Exhibit "  ). The calls for "death to Israel, death to America, and even death to Jews, on USC's campus were growing in numbers and I could not get to my office without being barred and accosted by protesters asking me, "Are you a Zionist?" "Do you support the Israeli death war machine?" On May 3, 2024, I was walking toward my office at USC when a group a visibly angry, scary and frightening

"protestors" approached me and asked me if I "Supported the Zionist baby killing entity" and then spat on me. I endured this for about 3 weeks before deciding that I would not return to campus again until this came to an end. What is all the more disturbing is the number of faculty members who openly protest with the students and some even cancelling their final exams so the students can protest daily.

106.    I did try to get to my office on May 2nd, 2024 only to be accosted again crossing Truesdale Parkway by thugs asking repeatedly if I "supported the Zionist entity." I refused to engage. On the way back to my car, I was approached by a woman asking if I wanted to participate in a "bake sale for Palestine" to help feed the children that Israel is intentionally starving. I kept walking and refused to engage.

107.    I feared for my safety and life in April – May 2024 and still entertain these fears as a result of the Campus Terrorists' actions, not knowing whether or when another Encampment or Jew Exclusion Zone will pop up on campus as a result of USC's appeasement policy and the way it dealt with the Campus Terrorists, the Jew Exclusion Zone and still deals with antisemitism on campus. There appears to be a continuing and growing anti-Semitism and terrorist threat on campus, which makes me and other Jewish professors anxious and apprehensive. All the while, USC continues to acquiesce to the flow and to appease, aid, abet, tolerate and encourage what has become an anti-Semitic mob on campus that is gaining mass appeal.

108.    The Holocaust in essence began at the universities in Germany when the Nazis prevented Jewish students from entering the campus and then forced out the Jewish professors. When our pathways are blocked and we are granted entry only when we attest that we do not support Israel, how are we free to both express their Jewish identity and perform our jobs at USC?

109.    Plaintiff DOE JEWISH USC STUDENT 1987, Individually And On Behalf Of All Others Similarly Situated (Plaintiff, Plaintiffs or "Jewish Student" or "Students," depending on the context) is and at all times herein mentioned was a Jewish student attending USC. Much like a victim of sexual abuse and assault, Jewish student fears for Jewish students life, liberty, safety

and health as well as the hostile educational environment caused and created by the filing of this lawsuit. In particular, Jewish Student is fearful of the risk to her continued attendance at and graduation from USC if Jewish student's identity is publicly disclosed, or if Plaintiff is "outed" by USC.

110.      Plaintiff Jewish student is suing herein individually and on behalf of all others similarly situated.

111.      The following is Jewish student's personal diary of the highly offensive, hateful, hurtful and obnoxious conduct Jewish student and other similarly situated Jewish students experienced and endured and continue to experience and endure as a result of the Campus Terrorists and of USC's aiding, abetting, encouragement, enabling and participation in the antisemitic mob's rule at USC:

112.      I don't travel to campus very often because I'm a hybrid physical therapy student at USC's Health Science campus. But when I do commute, it is for several consecutive days and I'm there at 8:00 AM to 10:00 PM for 7 to 8 days, in class, studying, and practicing skills with classmates.

113.      It used to be very safe and we would travel to and from and walk all around campus, from the parking lot, to CHP building and the Hyatt Hotel for more studying and meals.

114.      On April 2nd, USC President Carol Folt announced Asna Tabassum ("Tabassum") as the undergraduate valedictorian. As part of this honor, she was to give a speech at the upcoming commencement.. Upon recognition, it was mentioned that she was majoring in biomedical engineering and minoring in "resistance to genocide."

115.      On the surface this sounded great. An uprising against genocide of any group of people is a positive thing period. However, anti Israeli protesters have been using this term to justify the acts of October 7th. They claim that the act of rape, murder, torture and taking hostage was their "resistance to genocide."

116.      The "narrative" encouraged by USC and its faculty is offensive and hurtful to

Jews and paints all Jews in one broad brush as favoring genocide with respect to Palestinians. I have Holocaust survivors in my family and the independent State of Israel and its continued existence is very important to me and significant with respect to my religious beliefs. I similarly see no distinction between anti-Semitism and anti Zionism - by any name it is the hatred of Jews and the Jewish State of Israel.

117.    The valedictorian (Tabassum) has published several statements advocating for "the complete abolishment of the state of Israel" on the grounds of "ethnic cleansing and apartheid."

118.    It is shocking that someone with such strong anti-Semitic beliefs would be chosen by USC's administration and the trustees for such a high honor as valedictorian.  USC knew or certainly should have known the turmoil it was creating by such a poor choice. The community pushed back and voiced concern about what this anti-Semitic, venom-spewing and hate speaking and writing represents as valedictorian of 2024. This concern was likely fueled by both social media and the ongoing conflict in the Middle East. Regrettably and to the detriment of the other Jewish students and me, USC and the trustees and President Folt ignored the public uproar. Encampments and "Jew Exclusion Zones" were allowed to continue after April 29, 2024 and continued through at least May 5, 2025, as confirmed by an article published in "Deadline" by Bruce Haring, *USC Pro-Palestinian Encampment Cleared Again By Police*:

> "Encampments at USC have now been established and taken down three times, resulting in restricted access to the university. Disturbances grew in the wake of USC's decision not to let a pro-Palestinian [and pro-Hamas] valedictorian speak at its main graduation ceremony."

111.    On April 15, 2024, USC announced (in e-mail) that Asna was to remain valedictorian, but would no longer speak at commencement.

112.    While that should have been the end of it, when I began traveling to and from campus I had encountered several posters on our building doors that read and stated, "#Let Asna Speak." The posters had the same picture from the original newsletter that claimed she was valedictorian with her major and minor. In that moment, I recognized and grew fearful that I could no longer

feel safe on campus without USC's intervention and the implementation of systemic and institutional changes.

113.    The anti-Semitism allowed to pervade USC is no longer a problem isolated to the undergraduate or the main campus - it is now spread to all aspects of USC life, philosophy and policy and it's frightening to Jewish students like me and others similarly situated.

114.    USC now suffers from a pandemic of hate with respect to Jewish students attending the university and Jewish faculty members alike, as well as other similarly situated Jewish Plaintiffs herein who can no longer freely exercise their faith and ethnicity, or act like or be themselves out of fear of reprisal.  The anti-Semitism has also become systemic at USC's graduate campus.

115.    On April 17, 2024 I received another e-mail - this time from one of our own professors at the department of physical therapy.  The email asked everyone in the department to sign a petition to allow Asna to speak.  It also attached a message from Asna to the students of USC and the same picture of her from the original newsletter. She stated in her letter that USC's Provost had mistreated her and didn't give her a complete answer on why they would not allow her to speak. In fact, the Provost did not did explain it was due to security and safety of the community.

116.    On April 18, 2024 I received another e-mail from the same professor. It read "USC silent march for Asna. When USC silences Asna they are silencing all of us. Show up in support of Asna and demand USC let her speak at commencement. Wear a hoodie and mask to symbolize the institutional silencing Asna is experiencing."

117.    I am informed and believe that USC and the trustees knew or should have known about these hurtful emails, since they were sent using USC's official "edu," internet platform.

118.    I could not believe what I was reading.  Now I'm being harassed by my own department - the community in which I'm supposed to dedicate my time and energy to has abandoned me and the whole Jewish community.

119.    I couldn't understand how USC and my department would support her after all the hate speech she published.

120.    I'm the only Jewish student in my entire class and I felt like I had to keep it a secret. I didn't want to have a target on my back or deal with anyone strong opinions during an already stressful week of finals.

121.    That same day, a classmate (who I knew was Jewish) asked me what my opinion was on the topic of USC's decision to take Asna's speech away. I felt unsafe once again even among friends. Do I speak my truth and hope we are on the same page or do I brush it under a rug and avoid the topic just to keep some sense of peace in my class?  USC's decision still had a big impact on Jewish students lives.

122.    Unfortunately, to maintain a sense of normalcy and maintain relationships in school, I had to and still have to keep my opinions and identity to myself.

123.    Ironically USC prides itself on diversity, equity and inclusion. By failing to protect its Jewish students and leaving them to fend for themselves among the riots created by the Campus Terrorists," multiple Encampments, "Jew Exclusion Zone" and illegal occupation of school property USC failed to abide by its own standards.

124.    USC's failure to condemn anti-Semitism and its appeasement policy provides "cover" for hate mongers like Asna and justifies her antisemitic behavior.  Accordingly, Jewish student's fear and anxiety is real and justified.

125.    USC is a California private benefit corporation controlled by its Board of Trustees.

## CLASS ACTION ALLEGATIONS

126.    This is a Class Action originally filed in the Los Angeles County Superior Court and pursuant to the provisions of Code of Civil Procedure section 382, which is patterned after Rule 23 of the Federal Rules of Civil Procedure.  The case was removed to federal court on July 8, 2024 and is now governed by Rule 23.  Rule 23 and Section 382 both say substantially the same thing, namely:

> "[W]hen the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

(California Code of Civil Procedure section 382).

127.    Plaintiff DOE USC FACULTY MEMBER 2004, Individually And On Behalf Of All Others Similarly Situated ("Plaintiff," "Plaintiffs" or "Jewish Professor"), sues in Jewish professor's individual capacity as a Jewish USC professor who suffered damages, harm and was stigmatized as a result of USC's conduct, and as a representative on behalf of all others similarly situated Jewish professors.

128.    Plaintiff DOE JEWISH USC STUDENT 2004, Individually And On Behalf Of All Others Similarly Situated ("Plaintiff," "Plaintiffs" or "Jewish Student"), is a Jewish USC student who sues in Jewish student's individual capacity as a Jewish USC professor who suffered damages, harm and was stigmatized as a result of USC's conduct, and as a representative on behalf of all others similarly situated Jewish students.

129.    Both subclasses are ascertainable and sufficiently numerous. Jewish Professor is informed and believes that there are over 7,000 full-time Jewish USC faculty members and that a substantial number of them are similarly to Jewish Professor.  Plaintiff Jewish USC student is informed and believes that there are over 3,000 full-time Jewish USC students and that a substantial number of them are similarly situated to Jewish student.

130.    The Jewish professors and faculty members and Jewish students share the same common interests of wanting to be safe and free from Campus Terrorists and antisemitism on campus and safe and free from other harm including stigmatization, status discrimination, religious discrimination, assault, battery and other general damages.

131.    Plaintiffs also have the common interest of enjoying their freedom of travel, access and passage, and freedom to practice of their religion without discrimination or discriminatory practices, or fear of reprisal from USC-sponsored Campus Terrorists.  It remains to be seen what the Campus Terrorists would have done or would do in the future if USC again tolerated the creation of encampments or other "Jew Exclusion Zones."

131.    Judicial economy and efficiency will be served by treating and certifying this matter as a class action given the numerosity of plaintiffs in each subclass, common issues of fact and law and related common issues.

**RELIEF NEEDED**

132.     As set forth above, USC knowingly allowed violent activists to establish a Jew exclusion zone on USC's campus for several days during the spring quarter in 2024.

133.     Defendants had the ability to disband the encampment, which violated stated USC university policies, but instead chose to allow it to persist in flagrant violation of Plaintiffs' constitutional rights.

134.     USC had the ability to order USC police and private security officers to help Jewish students obtain equal access to campus, but did not and instead reinforced the exclusion zone. Intimidating protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests taking place at Columbia and other East Coast campuses as of the filing of this sack.

135.     Plaintiffs have been harmed by USC's previous allowance of the Jew exclusion zone and USC's campus and seek an order from this court or injunction to be able to continue their educational and professional pursuits on campus in peace and freedom.

136.     To know that they will be safe on campus, be free to exercise their religion, and receive the equal protection of the laws, plaintiffs need an order or injunction requiring USC to ensure that no Jew exclusion zone will be allowed in USC's campus, both during the pendency of this case and beyond.

### CLAIMS FOR RELIEF

### Count I

### VIOLATION OF CALIFORNIA'S BANE ACT (Civil Code section 52.1)

137.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 136 as if fully set forth at length herein.

138.     Under the Fourteenth Amendment to the United states Constitution, a state shall not "deny to any person within its jurisdiction the equal protection of the laws."

139.     The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

140.     USC has deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated individuals because Plaintiffs are ethnically and religiously Jewish. USC has knowingly allowed private individuals and outside agitators funded by donors who similarly fund on-campus political organizations that support the eradication of Jews, Israel and America to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non Jewish persons are permitted access to all areas of campus. Indeed, USC affirmatively assisted these actions by hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers - including the LAPD - not to intervene.

141.     USC furthered no legitimate or compelling state interest by engaging in this conduct.

142.     USC's failed to tailor their actions narrowly to serve any such interest.

143.     As a direct and proximate result of USC's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, losing the ability to grade exams or consult with students, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention and focus from study and work, and by other harms. As a direct and proximate result of the USC's actions, plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages and prejudgment and post-judgment interest. Absent injunctive and declaratory relief against defendants, plaintiffs will continue to be harmed by USC's actions.

144.     All times herein mentioned, USC aided and abetted paid outside agitators and student violent student protesters to cause plaintiffs to reasonably believe that if they exercised their right

to practice their religious faith and failed to denounce Zionist or baby killers and entered the Jew exclusion zone the violence would be committed against them in light of the campus terrorists apparent ability to carry out their threats and intimidation.

145.    At all times here in mentioned, the Campus Terrorists acted violently against Plaintiffs to prevent them from exercising their religious freedom in violation of the free exercise clause of the United States and California constitutions.

146.    Plaintiffs were harmed as a result of USC's actions and inaction, as more particularly alleged here and above.

147.    USC's conduct was a substantial factor in causing Plaintiffs' harm.

148.    In light of the determination of that the United States District Court now has jurisdiction over claims under California law that Plaintiffs originally filed in the Los Angeles County Superior Court to avoid federal jurisdiction, Plaintiffs are filing a motion for leave to amend this SAC and file a Third Amended Complaint ("TAC") concurrently herewith.  The purpose of Plaintiffs' motion for leave to amend is to assert claims under federal law and in particular, claims under 42 USC 1983 (Equal Protection Clause, First Amendment, Establishment Clause, Status Discrimination and Conspiracy) based on the same set of facts and circumstances as the facts and circumstances alleged herein.

### Count II

### VIOLATION OF CALIFORNIA'S UNRUH CIVIL RIGHTS ACT

### (Civil Code sections 51, 52)

144.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 137 through 143 of this SAC as if fully set forth at length herein.

145.    Under the Fourteenth Amendment to the United States Constitution, a state shall not "deny to any person within its jurisdiction the equal protection of the laws."

146.    The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

147.    USC has deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated

individuals because Plaintiffs are ethnically and religiously Jewish. USC has knowingly allowed private individuals and outside agitators funded by donors who similarly fund on-campus political organizations that support the eradication of Jews, Israel and America to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non Jewish persons are permitted access to all areas of campus. Indeed, USC affirmatively assisted these actions by hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers - including the LAPD - not to intervene.

148. USC furthered no legitimate or compelling state interest by engaging in this conduct.

149. USC's failed to tailor their actions narrowly to serve any such interest.

150. As a direct and proximate result of USC's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, losing the ability to grade exams or consult with students, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention and focus from study and work, and by other harms. As a direct and proximate result of the USC's actions, plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages and prejudgment and post-judgment interest. Absent injunctive and declaratory relief against defendants, plaintiffs will continue to be harmed by USC's actions.

151. All times herein mentioned USC aided and abetted paid outside agitators and student violent student protesters to cause plaintiffs to reasonably believe that if they exercised their right to practice their religious faith and failed to denounce Zionist or baby killers and entered the Jew exclusion zone the violence would be committed against them in light of the campus terrorists apparent ability to carry out their threats and intimidation.

152. At all times here in mentioned, the campus terrorists acted violently against plaintiffs to prevent them from exercising their religious freedom in violation of the free exercise clause of the United States and California constitutions.

153.    Plaintiffs were harmed as a result of USC's actions and inaction, as more particularly alleged here and above.

154.    USC's conduct was a substantial factor in causing Plaintiffs' harm.

155.    In light of the determination of that the United States District Court now has jurisdiction over claims under California law that Plaintiffs originally filed in the Los Angeles County Superior Court to avoid federal jurisdiction, Plaintiffs are filing a motion for leave to amend this SAC and file a Third Amended Complaint ("TAC") concurrently herewith.  The purpose of Plaintiffs' motion for leave to amend is to assert claims under federal law and in particular, claims under 42 USC 1983 (Equal Protection Clause, First Amendment, Establishment Clause, Status Discrimination and Conspiracy) based on the same set of facts and circumstances as the facts and circumstances alleged herein.

154.    As a result of USC's actions and inactions described above, USC denied, aided and incited a denial of discrimination and made a distinction that denied full and equal accommodations, advantages, facilities, privileges and services to Plaintiff Students in violation of the Unruh Act.

155.    A substantial motivating reason for USC's conduct was its perception that Plaintiffs' religion for religious beliefs were a substantial motivating reason for USC's conduct. Plaintiffs were harmed. USC's conduct was a substantial factor in causing Plaintiffs' harm.

## Count III

## VIOLATION OF CALIFORNIA'S RALPH CIVIL RIGHTS ACT

### (Civil Code section 51.7)

156.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 144 through 155 of this SAC as if fully set forth at length herein.

157.    At all times herein mentioned, USC aided, abetted, assisted, encouraged, and participated with the Campus Terrorists in creating the Encampments and "Jew Exclusion Zone," and continued to appease the Campus Terrorists during their occupation and siege of USC's Town Square.

158.    The Campus Terrorists threatened to commit violent acts and destroy property and in fact did commit violent acts against Plaintiffs or their property and harmed them, as alleged herein above.

159.    As alleged herein above, a substantial motivating reason for USC's conduct and inaction was because of Plaintiffs' religious beliefs.

**Count IV**

**NEGLIGENCE**

160.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 156 through 159 as though fully set forth at length herein.

161.    At all times herein mentioned, USC had a duty to protect Plaintiffs from harm, provide a school and educational experience where its students and faculty alike will be safe on campus, be free to exercise their religion, and receive the equal protection of the laws. USC also had a duty to take due care and avoid creating a dangerous condition on its public property.

162.    Despite having this duty, USC was negligent in knowingly allowing violent activists to establish a Jew Exclusion Zone on USC's campus for several days during the spring quarter in 2024 in flagrant violation of Plaintiffs' constitutional rights.

163.    USC had the ability to disband the encampment, which violated stated USC university policies, but instead chose to allow it to persist.

164.    USC had the ability to order USC police and private security officers to help Jewish students obtain equal access to campus, but did not and instead reinforced the exclusion zone.

165.    Intimidating protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests taking place at Columbia and other East Coast campuses as of the filing of this SAC.

166.    As a direct and proximate result of USC's actions and inaction, Plaintiffs have been harmed.

**Count V**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

167.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 160 through 166 as though fully set forth at length herein.

168.    At all times herein mentioned, USC had a duty to protect Plaintiffs from harm, provide a school and educational experience where its students and faculty alike will be safe on campus, be free to exercise their religion, and receive the equal protection of the laws.  USC also had a duty to take due care and avoid creating a dangerous condition on its public property.

169.    Despite having this duty, USC was negligent in knowingly allowing violent activists to establish a Jew Exclusion Zone on USC's campus for several days during the spring quarter in 2024.

170.    USC had the ability to disband the encampment, which violated stated USC university policies, but instead chose to allow it to persist.

171.    USC had the ability to order USC police and private security officers to help Jewish students obtain equal access to campus, but did not and instead reinforced the exclusion zone.

172.    Intimidating protest groups remain interested in reestablishing their encampment in the near future, have publicly stated their desire to do so, and have recently attempted to do so, as evidenced by the outrageous and violent protests taking place at Columbia and other East Coast campuses as of the filing of this SAC.

173.    As a direct and proximate result of USC's actions and inaction, Plaintiffs have been harmed and suffered serious emotional distress, including suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, stress, humiliation, loss of self esteem, stigmatization and shame.

**Count VI**

**BREACH OF CONTRACT**

174.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 167 Through 173 as though fully set forth at length herein.

175.    At all time here and mentioned, USC had a contractual duty to all plaintiffs to provide a campus and educational and work experience free from having to experience daily, violent pro-Hamas activists perpetrating a siege, taking over and occupying USC property, creating encampments to bar Jews and denying access to USC property by Plaintiffs unless they disavowed Zionism and other facets of their Jewish faith.

176.    Performed plaintiffs performed all of the contractual duties they were required to perform except for those excused by virtue of USC's non performance.

177.    USC breached its contract by failing to provide a safe campus that did not discriminate against Jews.

178.    As a direct and proximate result USC's breach of its contract, plaintiffs have been damaged in an amount to be shown at the time of trial in accordance with proof.

**Count VII**

**ASSAULT**

179.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 174 Through 178 as though fully set forth at length herein.

180.    At all time here and mentioned, for the reasons herein above, USC aided, abetted and encouraged violent protests to continue at USC unabated for days on end and allowed the Campus Terrorists to acted violently and threaten Jewish Students and Faculty by excluding any Jewish students and faculty from entering the Jew exclusion zone who did not disavow Zionism or other facets of their Jewish faith, threatened to throw projectiles at Plaintiffs - including water bottles – if they dared enter the exclusion zone and subsequently used water bottles as weapons against anyone who in fact did enter without the proper passwords or code.

190.    At all times herein mentioned, plaintiffs reasonably believed that they were about to be touched in a harmful or offensive manner.  Towards that end, Plaintiff Jewish Professor 2004 was actually spat on by one of the campus terrorists. At all times Sharon mentioned, the campus terrorists that USC aided or abetted threatened to touch Plaintiffs in a harmful or offensive manner.

192.    At all times herein mentioned, it reasonably appeared to Plaintiffs that the Campus Terrorists were about to carry out the threat.

193.    Plaintiffs did not consent to the Campus Terrorists' offensive and threatening conduct.

194.    Plaintiffs were harmed as a result of USC's conduct and inaction.

195.    USC's conduct and inaction was a substantial factor in bringing about such harm.

## Count VIII

## BATTERY

196.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 179 Through 195 as though fully set forth at length herein.

197.    At all time here and mentioned, for the reasons herein above, USC aided, abetted and encouraged violent protests to continue at USC unabated for days on end and allowed the Campus Terrorists to acted violently and threaten Jewish Students and Faculty by excluding any Jewish students and faculty from entering the Jew exclusion zone who did not disavow Zionism or other facets of their Jewish faith, threatened to throw projectiles at Plaintiffs - including water bottles – if they dared enter the exclusion zone and subsequently used water bottles as weapons against anyone who in fact did enter without the proper passwords or code.

198.    Plaintiffs are informed and believe and thereon allege that Campus Terrorists touched certain Jewish Student Plaintiffs or caused them to be touched with the intent to harm or offend them.

199.    USC knew that this would happen by virtue of its conduct, inaction and appeasement policy, and allowed it to happen by its inaction and stonewalling.

200.    Plaintiffs did not consent to the touching.

201.    Plaintiffs were harmed or offended by USC's conduct.

202.    A reasonable person in Plaintiffs' position would have been offended by the touching.

**Count IX**

**DECLARATORY RELIEF**

203.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 196 through 202 as though fully set forth at length herein.

203.    An actual controversy has arisen and now exists with respect to the dispute herein in that plaintiffs contend that USC has violated the First and Fourteenth amendments to the United states Constitution, the Ralph Civil Rights Act of 1976, the Tom Bane Civil Rights Act, the Jess Unruh Civil Rights Act, and federal civil rights laws including 42 USC 1983 and 1985 - whereas USC disputes these contentions.

204.    Pursuant to the federal "Declaratory Relief Act, Plaintiffs request and require this court to declare an adjudicate that the constitutional violations occurred and to issue a preliminary and permanent injunction prohibiting USC's unequal treatment of plainness in violation of plaintiffs constitutional and statutory rights.

**Count X**

**42 USC SECTION 1983**

**Equal Protection Clause**

205.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 203 through 204 as though fully set forth at length herein.

206.    Under the 14th Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

207.    The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

208.    Defendant has deprived Plaintiffs of equal protection of the laws, as secured by the 14th Amendment, through a policy and practice that treats plaintiffs differently than similarly situated individuals because plaintiffs are ethnically and religiously Jewish.

209.    Defendant has knowingly allowed private individuals to bar Jewish persons from parts of the USC campus because of their Jewish ethnicity and religion, while non-Jewish persons are permitted access to all areas of campus. Indeed, defendants affirmatively assisted these actions by

49

hiring private security guards that reinforced the zone, refusing to enforce stated policies that prohibited the zone, and instructing law enforcement officers not to intervene.

210.    Defendant furthered no legitimate or compelling state interest by engaging in this conduct.

211.    Defendant failed to tailor its actions narrowly to serve any such interest.

212.    As a result of defendants actions, plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including a hostile work and studying environment.

213.    As a direct and proximate result of defendants actions, plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages and prejudgment and post judgment interest.

214.    Absent injunctive and declaratory relief against defendant, plaintiff will continue to be harmed by defendants actions

215.    At all times here and mentioned, USC received substantial federal grants and funding, was subject to the provisions of Title 6 of the Civil Rights Act of 1964, including its ban on unconstitutional actions taken by educational institutions and universities serving the interests of the public and ban against antisemitism and discrimination against Jews in particular.  At all times herein mentioned, USC was and is considered a "state actor" for purposes of the civil rights laws, both federal and state, as confirmed by the Task Force's recent intervention and investigation of USC for violating federal antisemitism laws and failing to combat antisemitism in violation of federal laws.

### Count XI

### 42 USC SECTION 1983

### Free Exercise Clause

216.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 205 through 215 as though fully set forth at length herein.

218.    The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

219.    Under the Free Exercise Clause, a government action that burdens religious exercise triggers strict scrutiny when it is not neutral or generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

220. A policy is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

221.    USC treated Plaintiffs' religious exercises, including wearing Jewish symbols and expressing support for Israel, less favorably than comparable secular activities.  Defendant furthered no legitimate or compelling state interest by engaging in this conduct.

222. Defendant failed to tailor its actions narrowly to serve any such interest.

223. As a result of Defendant's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

224.    As a direct and proximate result of Defendant's actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post judgment interest.

225.    Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

### Count XII

### 42 USC SECTION 1983

### Free Exercise Clause – Religious Targeting

226. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 216 through 225.

227.    A law or policy "targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533. 363. Defendant targeted Plaintiffs' Jewish religious beliefs and practices for special disfavor in violation of the Free Exercise Clause.

228.    As a result of Defendant's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

229.    As a direct and proximate result of Defendant's actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post judgment interest.

230. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendant's actions.

### Count XIII

### 42 USC SECTION 2000d et. seq.

### Title VI of the Civil Rights Act of 1964

231. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs 226 through 230.

232.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

233.    USC receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

234.    Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. *Cf. Shaare Tefila*, 481 U.S.

at 616 (discrimination against Jews is discrimination based on race); see also 34 C.F.R. § 100.3(b)(1)(iv), (vi).

235. Defendant excluded Plaintiffs from participation in USC programs, denied Plaintiffs the full benefits of USC programs, and subjected Plaintiffs to discrimination, all in violation of Title VI.

236. As a result of Defendant's actions, Plaintiffs have been injured by losing access to educational opportunities, losing access to library and classroom facilities, losing in-person learning opportunities, losing the ability to prepare for exams, being denied equal participation in the life of the university, suffering emotional and physical stress that has diverted time, attention, and focus from study, and by other harms.

237. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post judgment interest

238. Absent injunctive and declaratory relief against Defendants, Plaintiffs will continue to be harmed by Defendants' actions.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

Declare that USC has violated the First and Fourteenth amendments to the United States Constitution, the California Constitution, the Tom Bane Civil Rights Act, the Jess Unruh Civil Rights Act, the Ralph Civil Rights Act, Title 6 of the Civil Rights Act of 1964, and violation of sections 42 USC sections 1983 and 1985 of the Ku Klux Klan Act;

Issue preliminary and permanent injunctive relief prohibiting USC's unequal treatment of Plaintiffs in violation of Plaintiffs' constitutional and statutory rights;

Award Plaintiffs compensatory, punitive, and nominal damages for the loss of their rights under California state law (and under federal law to conform to proof);

Award plaintiffs the cost of this action and reasonable attorneys fees

Awards such other and further relief as the court deems equitable and just.

1

**JURY DEMAND**

2

Plaintiffs request a trial by jury on all issues so triable

3

4       DATED: April 11, 2025                    LAW OFFICES OF MICHAEL E. REZNICK
                                                  A Professional Corporation
5

6

7       By:    /E.Jay Gotfredson/
                E. Jay Gotfredson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28